## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

STATE OF FLORIDA,

    *Plaintiff,*

    v.                           Case No. 8:21-cv-541

The UNITED STATES OF AMERICA;
ALEJANDRO MAYORKAS, Secretary
of the United States Department of
Homeland Security, in his official
capacity; UNITED STATES
DEPARTMENT OF HOMELAND
SECURITY; TROY MILLER, Acting
Commissioner of U.S. Customs and
Border Protection, in his official capacity;
U.S. CUSTOMS AND BORDER
PROTECTION; TAE JOHNSON,
Acting Director of U.S. Immigration and
Customs Enforcement, in his official
capacity; U.S. IMMIGRATION AND
CUSTOMS ENFORCEMENT; TRACY
RENAUD, Acting Director of U.S.
Citizenship and Immigration Services,
in her official capacity; U.S.
CITIZENSHIP AND IMMIGRATION
SERVICES,

    *Defendants.*

_____/

## COMPLAINT FOR DECLARATORY RELIEF AND
## PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

## INTRODUCTION

1.      Within hours of being sworn in, President Joseph R. Biden, Jr., and members of his administration violated their oaths of office, flouted Congressional statutes, failed to protect U.S. citizens and immigrants alike, and created what will quickly become a public-safety nightmare.

2.      For over two decades, administrations—both Democrat and Republican—detained and removed criminal aliens. This concept was so uncontroversial that the law imposing this non-discretionary requirement, 8 U.S.C. § 1226(c), was enacted in a bipartisan fashion and enforced for the eight years that Joseph Biden was Vice President.

3.      President Biden and members of his administration now seek to shirk their non-discretionary duty to detain and remove criminal aliens and, in a transparently pretextual fashion, justify that dereliction with the year-old COVID-19 pandemic. This abdication of duty is resulting and will continue to result in the release of dangerous drug traffickers, violent offenders, and other serious criminals into Florida and the nation's communities to wreak havoc and victimize anew.

4.      Under two memoranda, one issued by the Department of Homeland Security ("DHS") and one issued by Immigration and Customs Enforcement ("ICE"), the Biden Administration seeks to post hoc veto much of

the immigration scheme. (These memos are referred to as the "January 20 Memo" and the "February 18 Memo," respectively. *See* Ex. 1; Ex. 2).

5.      Unless a narrow set of prerequisites are met—such as, in addition to being in the country illegally, a person being a terrorist or an aggravated felon whom the Biden Administration additionally divines is a "public-safety" threat—immigration enforcement no longer exists. This is true even for aliens who have committed any number of serious crimes that do not qualify as aggravated felonies. The Biden Administration has even gone so far as to suspend "an operation that targeted illegal immigrants with sex crime convictions."[1]

6.      The Biden Administration has also stayed virtually all removals for 100 days, even for those with final orders of removal from an immigration judge.

7.      According to the President's own press secretary, "[n]obody is saying that DUIs or assault are acceptable behavior. And those arrested for such activities should be tried and sentenced as appropriate by local law enforcement. But we're talking about prioritization of who is going to be

---

[1] Caitlin McFall, *Eighteen state AGs urge Biden to reverse cancellation of ICE operation targeting sex offenders* (Feb. 18, 2021), https://www.foxnews.com/politics/18-state-ags-urge-biden-to-reverse-decision-to-cancel-ice-operation-targeting-sex-offenders.

deported from the country."[2] Put simply, the Biden Administration does not believe that being in the United States in violation of the immigration laws *and* committing serious crimes is sufficient reason to remove someone from the country.

8.     This unprecedented, flagrant disregard for the public safety of Americans and Floridians is a radical departure from even Obama-era policy. *See* Ex. 4. The Obama Administration would not have even considered giving aliens who commit domestic violence, burglary, or heroin trafficking a free pass from immigration consequences. *Id.* at 4–5. But the Biden Administration is doing just that. As one federal official put it, "[t]hey've abolished ICE without abolishing ICE."[3]

9.     The Biden Administration cannot simply order federal immigration officials to ignore the clear commands of Congress. The congressionally enacted immigration scheme, found in the Immigration and Nationality Act ("INA"), provides a specific, complex, and comprehensive framework for federal enforcement of the immigration laws. 8 U.S.C. § 1226(c),

---

[2] The White House, *Press Briefing by Press Secretary Jen Psaki* (Feb. 8, 2021), https://www.whitehouse.gov/briefing-room/press-briefings/2021/02/08/press-briefing-by-press-secretary-jen-psaki-february-8-2021/.

[3] Nick Miroff & Maria Sacchetti, *New Biden rules for ICE point to fewer arrests and deportations, and a more restrained agency* (Feb. 7, 2021), https://www.washingtonpost.com/national/new-biden-rules-for-ice-point-to-fewer-arrests-and-deportations-and-a-more-restrained-agency/2021/02/07/faccb854-68c6-11eb-bf81-c618c88ed605_story.html.

in particular, commands federal immigration authorities to arrest *all* criminal aliens. And 8 U.S.C. § 1231(a)(1)(A) requires federal officials to remove an alien within 90 days after issuance of a final order of removal.

10.  Although the Biden Administration has referred to these unlawful acts as an "interim policy" while they "conduct a review of policies and practices," Ex. 1 at 2, these acts are a codification of the Administration's long-term agenda, and they are causing and will cause the State of Florida immediate and irreparable harm.

11.  The actions taken through the memos also are not acts of "prosecutorial discretion" or "enforcement priorities." They are an outright abdication of executive responsibility and violate the clear commands of Congress, which the executive branch has no discretion to ignore.

12.  The Biden Administration's actions will allow criminal aliens to be released into and move freely in the State of Florida, and their resulting crime will cost the State millions of dollars on law enforcement, incarceration, and crime victim's assistance. It will also cause unquantifiable harm to Florida's citizenry and will force the State to expend its own law enforcement resources to pick up the slack. And because *Arizona v. United States* prevents States from "engag[ing] in" their own immigration "enforcement activities," 567 U.S. 387, 410 (2012), the only remedy is for this Court to set aside and preliminarily and permanently enjoin these unlawful acts.

4

**PARTIES**

13.     Plaintiff State of Florida is a sovereign State and has the authority and responsibility to protect the wellbeing of its public fisc and the health, safety, and welfare of its citizens. Florida "bears many of the consequences of unlawful immigration." *Arizona*, 567 U.S. at 397.

14.     Defendants are the United States, appointed officials of the United States government, and United States governmental agencies responsible for the issuance and implementation of the challenged administrative actions.

15.     Florida sues Defendant the United States of America under 5 U.S.C. §§ 702–703 and 28 U.S.C. § 1346.

16.     Defendant Alejandro Mayorkas is the Secretary of DHS. His predecessor issued the January 20 Memo. Florida sues him in his official capacity.

17.     Defendant DHS is implementing the January 20 Memo. DHS oversees Defendants U.S. Citizenship and Immigration Services ("USCIS"), U.S. Customs and Border Protection ("CBP"), and ICE.

18.     Defendant Tae Johnson is the Acting Director of ICE. He received the January 20 Memo and issued the February 18 Memo. Florida sues him in his official capacity.

19.     Defendant Troy Miller is the Acting Commissioner of CBP. He received the January 20 Memo. Florida sues him in his official capacity.

20.     Defendant Tracy Renaud is the Acting Director of USCIS. She received the January 20 Memo. Florida sues her in her official capacity.

## JURISDICTION AND VENUE

21.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, 1361 and 5 U.S.C. §§ 702–703.

22.     The Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. § 706, 28 U.S.C. § 1361, and 28 U.S.C. §§ 2201–2202.

23.     Venue lies in this district pursuant to 28 U.S.C. § 1391(e)(1) because the State of Florida is a resident of this judicial district and because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district—this district includes four of Florida's five largest cities.

## FACTUAL BACKGROUND

### Federal Immigration Enforcement

24.     "[T]he Immigration and Nationality Act ('INA') . . . establishes a comprehensive scheme for aliens' exclusion from and admission to the United States." *Moorhead v. United States*, 774 F.2d 936, 941 (9th Cir. 1985).[4]

---

[4] Following the creation of DHS, many of the INA's references to the "Attorney General" are now understood to refer to the Secretary of DHS. *See La. Forestry Ass'n, Inc. v. Sec'y U.S. Dep't of Labor*, 745 F.3d 653, 659 (3d Cir. 2014).

25.     8 U.S.C. § 1227(a) lays out the "classes of deportable aliens." Among others, these classes include any alien who is "[p]resent in violation of law." *Id.* § 1227(a)(1)(B). They also include aliens—even lawfully present aliens—who commit certain acts, including, for example, several criminal offenses. *Id.* § 1227(a)(2).

26.     Under 8 U.S.C. § 1226(a), DHS "may" arrest and detain an alien pending removal proceedings. In 1996, however, Congress grew "concerned that deportable criminal aliens who are not detained continue to engage in crime." *Demore v. Kim*, 538 U.S. 510, 513 (2003). Because of that concern, and because Congress was "frustrated with the ability of . . . criminal aliens" to "avoid deportation," Congress enacted § 1226(c) to ensure that federal authorities "det[ain] and remov[e] *all* criminal aliens." *In re Rojas*, 23 I. & N. Dec. 117, 122 (BIA 2001) (en banc) (emphasis in original); *accord Preap v. Nielsen*, 139 S. Ct. 954, 960 (2019).

27.     Through § 1226(c), Congress revoked the discretionary "may" language in § 1226(a) for criminal aliens, and directed that federal authorities "*shall* take into custody any alien" who qualifies as a "criminal alien[] . . . when the alien is released" from criminal custody. 8 U.S.C. § 1226(c) (emphasis added).

28.     Congress enacted § 1226(c) in a bipartisan fashion. And the legislative history reflects "a consensus" that "there is just no place in

America for non-U.S. citizens who commit criminal acts here." S. Rep. No. 104–48, at 6 (1995); *see* G. Savaresse, *When is When?: 8 U.S.C. § 1226(c) & the Requirements of Mandatory Detention*, 82 Fordham L. Rev. 285, 299 (2013).

29.     Criminal aliens, for purposes of § 1226(c), include aliens who have committed specified crimes. As most relevant there, it includes aliens who have committed crimes of moral turpitude, 8 U.S.C. § 1182(a)(2)(A), *id.* § 1227(a)(2)(A)(i); crimes involving controlled substances, *id.* § 1182(a)(2)(A), *id.* § 1227(a)(2)(B); human trafficking, *id.* § 1182(a)(2)(H); money laundering, *id.* § 1182(a)(2)(I); aggravated felonies, *id.* § 1227(a)(2)(A)(iii); and specified firearms offenses, *id.* § 1227(a)(2)(C).

30.     When an alien is arrested, either pursuant to DHS's discretion under § 1226(a) or, for criminal aliens, as commanded by Congress under § 1226(c), the alien is placed in removal proceedings before an immigration judge. If the alien is not a criminal alien, DHS has discretion to continue detention pending removal or to release the alien on bond or parole. *See* 8 U.S.C. § 1226(a)(1)–(2). If the alien is a criminal alien, DHS has no discretion to release the alien except under limited circumstances not implicated here. *See* 8 U.S.C. § 1226(c); *Preap*, 139 S. Ct. at 960.

31.     Once an alien's rights are adjudicated and he is ordered removed, DHS "shall remove the alien from the United States within a

period of 90 days" unless specified exceptions are met. *See* 8 U.S.C. § 1231(a)(1)(A).

<u>State Cooperation with Federal Immigration Enforcement</u>

32.    For decades, States like Florida have relied on the federal government's enforcement of and compliance with the INA in general and §§ 1226(c) and 1231(a)(1)(A) in particular, especially after the Supreme Court clarified that States cannot "engage in" their own immigration "enforcement activities." *Arizona*, 567 U.S. at 410.

33.    Even though *Arizona* prevents Florida from taking matters into its own hands, *Arizona* also recognizes that "States . . . bear[] many of the consequences of unlawful immigration." *Id.* at 397. Nowhere are these consequences more obvious than when criminal aliens are released back into Florida's communities to reoffend rather than being removed from the country.

34.    The previous two administrations understood this reality. Under President Trump, any removable alien convicted of a crime or with pending criminal charges was a priority. Ex. 3 at 3. And although President Obama took a different approach to immigration enforcement overall, his administration agreed with the Trump Administration on the importance of immigration enforcement against criminals, including aliens who committed any felony, any "significant misdemeanor," such as "domestic violence,"

9

"sexual abuse or exploitation," "burglary," "unlawful possession or use of a firearm," "drug distribution or trafficking," and "driving under the influence," and aliens who were repeat offenders of even minor misdemeanors. Ex. 4 at 4–5.

35.    Relying on these consistent efforts by the federal government to remove criminal aliens from Florida, and to do everything possible to ensure their efficacy, Florida passed Senate Bill 168 in 2019. It is codified in Chapter 908 of the Florida Statutes and requires all state and local officials to inform the federal government when they will release aliens from criminal custody, § 908.105, Fla. Stat.; *id.* § 908.102(6)(b); *id.* § 908.103, and even to detain those aliens pursuant to an immigration warrant if federal officials cannot arrive in time. § 908.105, Fla. Stat.; *id.* § 908.102(6)(a); *id.* § 908.103.

36.    Florida's sheriffs have also made significant efforts to facilitate cooperation with ICE, including 47 sheriffs' offices entering formal cooperation agreements. The Florida Department of Corrections has also entered into such an agreement.

37.    Florida has good reasons for seeking to assist the federal government. In fiscal year 2020, which ended September 2020, ICE's Miami Office—its main office in Florida—removed 7,046 aliens.[5] Of those, 3,476 were

---

[5] U.S. Immigration and Customs Enforcement, *Removals by Field Office (Area of Responsibility) and Month* (FY2020), https://www.ice.gov/doclib/news/library/reports/annual-report/ero-fy20-localstatistics.pdf. This was down from 9,750 the previous year, likely due to

convicted criminals and 1,356 had pending criminal charges. In other words, 69% of these individuals, in addition to violating civil immigration laws, were caught engaging in criminal activity.

38.     Moreover, according to the federal government's own study of the recidivism rates of state prisoners, "68% of released prisoners [are] arrested [again] within 3 years, 79% within 6 years, and 83% within 9 years."[6] Further, because prisoners are often arrested numerous times after being released, the study found an average of five arrests *per prisoner* within the 9 years following release from state prison. Because of these high recidivism rates, the failure to remove criminal aliens necessarily results in additional crimes in Florida, victimizing Florida's citizenry and costing the State public funds and essential law enforcement resources.

<u>The Biden Administration's Actions</u>

39.     On January 20, 2021, the day he took office, President Biden issued Executive Order 13993, Revisions of Civil Immigration Enforcement Policies and Priorities, 86 Fed. Reg. 7051 (Jan 20, 2021). That same day, DHS issued its stand down order. Ex. 1.

---

COVID. *See* U.S. Immigration and Customs Enforcement, *Removals by Field Office (Area of Responsibility) and Month* (FY2019),
https://www.ice.gov/sites/default/files/documents/Report/2019/ero-fy19-localstatistics.pdf.

[6] U.S. Department of Justice, National Institute of Justice, *Measuring Recidivism* (Feb. 20, 2018), https://nij.ojp.gov/topics/articles/measuring-recidivism#statistics.

40.     The January 20 Memo does three things. *First*, it requires review of the federal government's existing immigration policies. Ex. 1 at 3.

41.     *Second*, under the guise of "interim enforcement priorities," the January 20 Memo orders DHS, effective February 1, to cease virtually all civil immigration enforcement except for removable aliens who came to the United States on or after November 1, 2020. As to the removable aliens who are already here, they get a free pass unless they are a terrorist, a spy, or an aggravated felon whom DHS separately determines to be a public-safety threat. Ex. 1 at 3–4.

42.     *Third*, the memo orders "an immediate pause on removals of any noncitizen with a final order of removal . . . for 100 days," subject to narrow exceptions. Ex. 1 at 4–5.

43.     On January 26, 2021, a district court in the Southern District of Texas entered a nationwide temporary restraining order against the 100-day stay of removals, and on February 23, the court converted its order into a preliminary injunction. *Texas v. United States*, 2021 WL 723856, at *4, *53 (S.D. Tex. 2021).[7]

---

[7] The "interim enforcement priorities" are not at issue in the Texas litigation.

44.     On February 18, ICE issued another stand down order.[8] Ex. 2. The February 18 Memo largely reiterates the "interim enforcement priorities." It clarifies that DHS "anticipates" issuing new guidelines after 90 additional days, but that the January 20 and February 18 Memos are the authoritative, operative documents governing immigration enforcement unless DHS says otherwise. Ex. 2 at 2.

45.     The February 18 Memo also purports not to prohibit civil immigration enforcement actions against those who fall outside the "enforcement priorities," but it makes clear that, to do so, an ICE officer must submit a justification in writing and receive approval from the Field Office Director or Special Agent in Charge. Ex. 2 at 4, 6–7.

46.     The February 18 Memo, with the permission of DHS, also modifies the "interim enforcement priorities" in one significant way. Ex. 2 at 2. It adds to the priority list removable aliens who are gang members, but only if ICE can prove that these gang members are furthering the illegal activity of the gang and separately determines them to be a public-safety threat. Ex. 2 at 5–6.

---

[8] Because the 100-day stay of removals is enjoined nationwide, the February 18 Memo addresses only the "interim enforcement priorities." Ex. 2 at 3.

47.     Both the January 20 and February 18 Memos try to justify these actions based on "limited resources" and the COVID-19 pandemic. Ex. 1 at 2–3; Ex. 2 at 3.

## Irreparable Harm to Florida

48.     The agency action within the memos is irreparably harming Florida and will continue to do so.

49.     As a result of the memos, ICE is refusing to take custody of scores of criminal aliens across the State—resulting in their release into Florida—and it will only get worse. The Florida Department of Corrections already reports seven instances of ICE refusing to take custody of serious criminals upon release from state custody. *See* Ex. 5; Ex. 6. According to emails from ICE to state officials, ICE is refusing to take custody of these aliens because they "do[] not meet the current interim civil immigration enforcement priorities issued on January 20, 2021." Ex. 5 at 6.

50.     The criminal activity of these seven aliens is disturbing. Several of them have multiple burglary convictions, Ex. 6 at 3, 6, 9, 12, including one who appears to have gone on a burglary spree, Ex. 6 at 9. A number also have serious drug convictions, including for cocaine and heroin trafficking. Ex. 6, at 6, 11–18.

51.     These dangerous individuals apparently do not rise to the level of being a public-safety threat for the Biden Administration. They—and

other criminals like them—will be released back into Florida absent this Court's intervention. Some already have been.

52.     And this only captures a small fraction of what is happening and will happen in Florida. Much of the State's cooperation with ICE goes on in local jails rather than state prisons. In Pasco County alone—just 1 of Florida's 67 counties—ICE has already canceled detainers[9] for several aliens whose crimes include domestic violence and violating a restraining order.

53.     Even extrapolating Pasco County's experience over Florida's other 66 counties would not fully capture the effect of the memos in Florida. The memos apply equally to federal inmates, and the federal inmate population in Florida is another 8,801 criminals, around 21% of which are aliens.

54.     Moreover, almost 30% of ICE's civil immigration arrests—at least in fiscal year 2017—were at-large arrests. As a result of the memos, criminal aliens who have already been released and are currently at-large in Florida will not be arrested and detained by ICE, including, for example,

---

[9] Detainers are ICE's request to be notified before an alien is released from criminal custody.

the aliens "with sex crime convictions" who were the target of an enforcement operation that the Biden Administration recently canceled.[10]

55.    And the 100-day-removal pause will further contribute to the release of criminal aliens into Florida's communities. *See Texas*, 2021 WL 723856, at *15. In fiscal year 2020, which ended September 2020, ICE's Miami office removed 7,046 aliens.[11] Of those, 3,476 were convicted criminals and 1,356 had pending criminal charges.

56.    And, because of the law surrounding alien detention, the longer an alien is detained following a final order of removal, and the less certain his prospects of actual removal, the more likely it is that ICE will release him. *See, e.g.*, *Texas*, 2021 WL 723856, at *45 (discussing *Zadvydas v. Davis*, 533 U.S. 678, 683–84, 701 (2001)).

57.    An increase in criminal aliens in Florida will cause a wide variety of harms.

58.    *First,* given the high recidivism rates among those released from state prison, *see* ¶ 38, it is a statistical certainty that the scores of criminal aliens released into Florida will commit additional crimes in Florida. In fact,

---

[10] Caitlin McFall, *Eighteen state AGs urge Biden to reverse cancellation of ICE operation targeting sex offenders* (Feb. 18, 2021), https://www.foxnews.com/politics/18-state-ags-urge-biden-to-reverse-decision-to-cancel-ice-operation-targeting-sex-offenders.

[11] U.S. Immigration and Customs Enforcement, *Removals by Field Office (Area of Responsibility) and Month* (FY2020), https://www.ice.gov/doclib/news/library/reports/annual-report/ero-fy20-localstatistics.pdf.

even just taking the seven aliens discussed above, a number of them had committed crimes before and been incarcerated in Florida's prison system. Ex. 6 at 6, 12.

59.    *Second*, Florida is spending approximately $120 million a year incarcerating aliens at the state level alone. When criminal aliens released back into Florida reoffend, they will be reincarcerated by Florida, resulting in an increase in those costs.

60.    *Third*, the criminal activity of these aliens will drain the State's law enforcement resources, which will cost the State millions of dollars and, just as importantly, pull resources away from other public-safety threats.

61.    *Fourth*, in addition to law enforcement costs, Florida spends additional resources on those engaged in criminal activity, including, for example, substance abuse and mental health services. For current patients who lack lawful immigration status, alone, the Department of Children and Families ("DCF") has spent over $32 million on those services. And there may be some patients who lack lawful immigration status that DCF is not aware of.

62.    *Fifth*, the criminal activity of these aliens will cost the State money and resources to care for the victims. The Attorney General's Office, for example, spent almost $3.6 million last year on domestic violence relocation services. And DCF spends tens of millions of dollars, if not more,

on domestic-violence and child-welfare services for crime victims, including those who lack lawful immigration status.

63.    Florida now seeks relief from this Court.

## CLAIMS

## COUNT 1

### Agency action that is not in accordance with law and is in excess of authority

64.    Florida repeats and incorporates by reference ¶¶ 1–63.

65.    Under the Administrative Procedure Act ("APA"), a court must "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory . . . authority, or limitations, or short of statutory right." *See* 5 U.S.C. § 706(2)(A), (C).

66.    The January 20 and February 18 Memos violate 8 U.S.C. §§ 1226(c) and 1231(a)(1)(A).

67.    Congress added § 1226(c) to "*subtract* some of th[e] discretion" DHS possessed under § 1226(a)—specifically, the discretion not to "arrest . . . criminal aliens." *Preap*, 139 S. Ct. 966 (emphasis in original); *see id.* ("The Secretary *must* arrest those aliens guilty of a predicate offense." (emphasis in original)).

68.    The January 20 and February 18 Memos ignore this command in at least two ways. *First*, they limit DHS's and ICE's enforcement to terrorists,

spies, aggravated felons, and certain gang members. Ex. 1 at 3; Ex. 2 at 5–6. But § 1226(c)'s commands apply to aliens who commit many other crimes, including crimes of moral turpitude, 8 U.S.C. § 1182(a)(2)(A), *id.* § 1227(a)(2)(A)(i); crimes involving controlled substances, *id.* § 1182(a)(2)(A), *id.* § 1227(a)(2)(B); human trafficking, *id.* § 1182(a)(2)(H); money laundering, *id.* § 1182(a)(2)(I); and specified firearms offenses, *id.* § 1227(a)(2)(C). The memos ignore these requirements. *Second*, even for aggravated felons and specified gang members, the memos require a separate public-safety analysis, which contradicts the mandatory nature of § 1226(c). Ex. 1 at 3; Ex. 2 at 5–6.

69.    In purporting to exercise discretion that does not exist, and in ignoring the clear statutory requirements of § 1226(c), the Defendants have violated the APA.

70.    The same is true with respect to § 1231(a)(1)(A). "[T]he text, context, statutory history, and precedent" show that § 1231(a)(1)(A) "unambiguously means" that the Government "*must* remove" aliens with final orders of removal within 90 days of those orders. *Texas*, 2021 WL 723856, at *36, 38 (emphasis in original). In requiring a 100-day stay of removals, the agencies have violated the APA.

19

71.     Because these acts are required by law, they are not discretionary. Therefore, the illegal actions contemplated by the memos are not committed to agency discretion by law.

72.     Finally, the memos are final agency action because they "mark the consummation of the agencies' decisionmaking process"—they are not "merely tentative or interlocutory." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1813 (2016). And they determine "rights or obligations . . . from which legal consequences will flow." *Id.*

73.     As discussed above, the memos are already having irreversible and significant consequences for Florida. And one court has already held that the January 20 Memo's 100-day stay of removals is final agency action. *Texas*, 2021 WL 723856 at *32. The "enforcement priorities" are for the same reasons.

## COUNT 2

### Arbitrary and capricious agency action

74.     Florida repeats and incorporates by reference ¶¶ 1–63, 71–73.

75.     Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

76.     The agencies failed to provide adequate reasoning behind the factors they purported to consider, *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016), pointed to pretextual reasons, *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573–74 (2019), ignored important aspects of the

20

problem, *Michigan v. EPA*, 576 U.S. 743, 751–53, 759–60 (2015), and failed to justify their departing from the decades-old policy to enforce immigration laws against criminal aliens by considering lesser alternatives and reliance interests, *DHS v. Regents of the U. of Cal.*, 140 S. Ct. 1891, 1913 (2020); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

77.   *First*, DHS and ICE "point[ed] . . . to [no] data," *Nat'l Treasury Emps. Union v. Horner*, 854 F.2d 490, 499 (D.C. Cir. 1988), to "explain why" they took the actions in the memos, *Motor Vehicle Mfrs. Ass'n, v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983). The agencies asserted that limited resources and COVID-19 justified their actions. But they provided no evidence to support this argument, particularly evidence as to why the myriad other laws the federal government enforces can continue but the vast majority of immigration enforcement must cease. *See Tripoli Rocketry Ass'n, v. ATF*, 437 F.3d 75, 77 (D.C. Cir. 2006) (vacating agency action because the agency offered no supporting evidence).

78.   *Second*, and relatedly, the reasons DHS and ICE did provide were pretextual. *See Commerce*, 139 S. Ct. at 2573–74. As the Biden Administration

has admitted, the reason for the memos is that the Biden Administration *does not want* to enforce the immigration laws, not that it *can't*.[12]

79.   *Third*, DHS and ICE ignored an important aspect of the problem: the massive costs imposed by its actions, including on States like Florida. Costs are "a centrally relevant factor when deciding whether to regulate." *Michigan*, 576 U.S. at 752–53. The memos do not mention costs at all.

80.   *Fourth*, DHS and ICE failed to explain their "extreme departure from prior practice," *E. Bay Sanctuary Covenant v. Trump*, 349 F. Supp. 3d 838, 858 (N.D. Cal. 2018), as required by the APA, *Regents*, 140 S. Ct. at 1913. The memos combine for twelve pages of conclusory assertions such that DHS barely even "display[s] awareness that it *is* changing position." *Fox Television*, 556 U.S. at 515 (emphasis in original).

81.   And the agencies ignored lesser alternatives to their extreme departure that would still fall within the "ambit" of the Obama and Trump Administrations' approach. *See* Ex. 3; Ex. 4.

82.   DHS and ICE also ignored the reliance interests of States like Florida. Florida has relied on the federal government for decades to protect it from criminal-alien crime, including enacting an entire statutory scheme in

---

[12] *See* The White House, *Press Briefing by Press Secretary Jen Psaki* (Feb. 8, 2021), https://www.whitehouse.gov/briefing-room/press-briefings/2021/02/08/press-briefing-by-press-secretary-jen-psaki-february-8-2021/.

support of the federal government's practices, *see* Ch. 908, Fla. Stat., and entering into dozens of agreements with the federal government.

83.    "Ignor[ing]" these reliance interests and failing to consider lesser alternatives is "arbitrary and capricious." *Regents*, 140 S. Ct. at 1913.

84.    The agencies' actions in the memos are, therefore, arbitrary and capricious and should be set aside. 5 U.S.C. § 706.

## COUNT 3

### Failure to provide notice and comment

85.    Florida repeats and incorporates by reference ¶¶ 1–63, 71–73.

86.    The APA required DHS and ICE to provide notice of, and comment on, the memos because they are substantive rules that "affect individual rights and obligations." *Chrysler Corp. v. Brown*, 441 U.S. 281, 303 (1979); *see* 5 U.S.C. § 553. One court has already held that the 100-day pause on removals required notice and comment, *Texas*, 2021 WL 723856, at *43–48, and the "enforcement priorities" do for the same reasons.

87.    Further, the Eleventh Circuit has held that federal immigration officials must engage in rulemaking when changing a policy to detain *more* aliens. *Jean v. Nelson*, 711 F.2d 1455, 1469, 1476, 1478 (11th Cir. 1983). Changing a decades-old policy to detain *less* aliens (or to remove less aliens)— especially when doing so violates clear statutory commands—is no different.

## COUNT 4

### Violation of 8 U.S.C. § 1226(c)

88.     Florida repeats and incorporates by reference ¶¶ 1–63, 66–68.

89.     DHS and ICE have violated 8 U.S.C. § 1226(c) by ignoring its command to detain criminal aliens.

90.     For the reasons described in Count 1, even putting the APA aside, DHS's and ICE's straightforward violations of federal law must be enjoined.

## COUNT 5

### Violation of 8 U.S.C. § 1231(a)(1)(A)

91.     Florida repeats and incorporates by reference ¶¶ 1–63, 66, 70.

92.     DHS and ICE have violated 8 U.S.C. § 1231(a)(1) by refusing for 100 days to remove aliens with final orders of removal.

93.     For the reasons described in Count 1, even putting the APA aside, DHS's and ICE's straightforward violations of federal law must be enjoined.

## COUNT 6

### Violation of the take care clause

94.     Florida repeats and incorporates by reference ¶¶ 1–63, 66–70.

95.     The executive branch is tasked with "tak[ing] Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. This requirement applies to the Defendants. *See* U.S. Const. art. II, § 1, cl. 1 (vesting "[t]he executive Power" in the President).

96.     The memos violate this requirement because they order DHS and ICE not to enforce federal law.

97.     The memos therefore are unconstitutional and should be enjoined under the APA, 5 U.S.C. §706, or independent of the APA under the take-care clause itself.

## Count 7

### Violation of the separation of powers

98.     Florida repeats and incorporates by reference ¶¶ 1–63, 66–70.

99.     Where, as here, the executive branch "takes measures incompatible with the expressed or implied will of Congress, [its] power is at its lowest ebb." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (Jackson, J., concurring).

100.    Executive discretion over immigration is not inherent. Rather, authority over immigration belongs to Congress, *see* U.S. Const. Art. I, § 8, and the executive branch's discretion flows from "the vague and sweeping language employed by Congress." *Jean v. Nelson*, 727 F.2d 957, 967 (11th Cir. 1984). Therefore, where Congress instead uses specific, mandatory language, this broad discretion does not exist. *See id.* ("[E]xecutive officials function as agents of Congress in enforcing the law.").

101.    The memos therefore are ultra vires and unconstitutional.

## PRAYER FOR RELIEF

For these reasons, Florida asks the Court to:

a) Hold unlawful and set aside the January 20 Memo.

b) Hold unlawful and set aside the February 18 Memo.

c) Issue preliminary and permanent injunctive relief enjoining Defendants from enforcing the January 20 Memo.

d) Issue preliminary and permanent injunctive relief enjoining Defendants from enforcing the February 18 Memo.

e) Issue declaratory relief declaring the January 20 Memo ultra vires and unconstitutional.

f) Issue declaratory relief declaring the February 18 Memo ultra vires and unconstitutional.

g) Postpone the effective date of the January 20 Memo.

h) Postpone the effective date of the February 18 Memo.

i) Award Florida costs and reasonable attorney's fees.

j) Award such other relief as the Court deems equitable and just.

Respectfully submitted,

Ashley Moody
ATTORNEY GENERAL

John Guard (FBN 374600)
CHIEF DEPUTY ATTORNEY GENERAL

*/s/ James H. Percival*
James H. Percival* (FBN 1016188)
CHIEF DEPUTY SOLICITOR GENERAL
*Lead Counsel

Jason H. Hilborn (FBN 1008829)
ASSISTANT SOLICITOR GENERAL

Anita Patel (FBN 70214)
SENIOR ASSISTANT ATTORNEY GENERAL

Rachel Kamoutsas (FBN 106869)
DEPUTY GENERAL COUNSEL

Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
james.percival@myfloridalegal.com

*Counsel for the State of Florida*