## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

STATE OF FLORIDA,

    *Plaintiff,*

    v.                          Case No. 8:21-cv-541-CEH-SPF

UNITED STATES OF AMERICA,
*et al.*,

    *Defendants.*

_____

### FLORIDA'S MOTION FOR A PRELIMINARY INJUNCTION

Congress enacted § 1226(c) in 1996 to withdraw immigration officials' discretion and instruct them to "det[ain] and remov[e] *all* criminal aliens." *In re Rojas*, 23 I. & N. Dec. 117, 122 (BIA 2001) (en banc) (emphasis in original). This concept was so uncontroversial that Republicans and Democrats alike have consistently enforced it, including for the eight years that Joseph R. Biden, Jr., was Vice President.

Within hours of being sworn in, however, President Biden and his administration decided to ignore federal law, violate their oaths of office, and create a public-safety nightmare for U.S. citizens and immigrants alike. And, in a transparently pretextual fashion, they seek to justify that dereliction with the year-old COVID-19 pandemic.

1

This abdication of duty is resulting and will continue to result in the release of dangerous drug traffickers, violent offenders, and other serious criminals into Florida and the nation's communities to wreak havoc and victimize anew. Florida seeks to preliminarily enjoin this patent violation of law, protect Floridians and those within its borders, and prevent the irreparable harm that this irresponsible action is causing and will cause.

## BACKGROUND

### The Immigration Scheme

"[T]he Immigration and Nationality Act ('INA') . . . establishes a comprehensive scheme for aliens' exclusion from and admission to the United States." *Moorhead v. United States*, 774 F.2d 936, 941 (9th Cir. 1985). 8 U.S.C. § 1227(a) lays out the "classes of deportable aliens." Among others, these classes include any alien who is "[p]resent in violation of law." *Id.* § 1227(a)(1)(B). They also include aliens—even lawfully present aliens—who commit certain acts, including, for example, several criminal offenses. *Id.* § 1227(a)(2).

Under 8 U.S.C. § 1226(a),[1] the Department of Homeland Security ("DHS"), including its interior enforcement arm, Immigration and Customs

---

[1] Following the creation of DHS, many references to the "Attorney General" now refer to the Secretary of DHS. *La. Forestry Ass'n v. Dep't of Labor*, 745 F.3d 653, 659 (3d Cir. 2014).

Enforcement ("ICE"), "may" arrest and detain an alien pending removal proceedings.

In 1996, however, Congress grew "concerned that deportable criminal aliens who are not detained continue to engage in crime." *Demore v. Kim*, 538 U.S. 510, 513 (2003). Because of that concern, and because Congress was "frustrated with the ability of . . . criminal aliens" to "avoid deportation," Congress enacted § 1226(c) to ensure that federal authorities "det[ain] and remov[e] *all* criminal aliens." *In re Rojas*, 23 I. & N. Dec. at 122 (emphasis in original); *accord Preap v. Nielsen*, 139 S. Ct. 954, 960 (2019). Through § 1226(c), Congress revoked the discretionary "may" language in § 1226(a) for criminal aliens, and directed that federal authorities "*shall* take into custody any alien" who qualifies as a "criminal alien[] . . . when the alien is released" from criminal custody.[2] 8 U.S.C. § 1226(c) (emphasis added).

Congress enacted § 1226(c) in a bipartisan fashion, and the legislative history reflects "a consensus" that "there is just no place in America for non-U.S. citizens who commit criminal acts here." S. Rep. No. 104-48, at 6 (1995); *see* G. Savaresse, *When is When?: 8 U.S.C. § 1226(c) & the Requirements of Mandatory Detention*, 82 Fordham L. Rev. 285, 299 (2013).

---

[2] Before 1996, what is now § 1226(a) was codified in § 1252(a). *See Demore*, 538 U.S. at 519. Section 1252(a) contained a narrower mandatory arrest and detention provision, which applied only to "aggravated felon[s]." *See* 8 U.S.C. § 1252(a)(2)(A) (1994).

3

Criminal aliens, for purposes of § 1226(c), include aliens who have committed specified crimes. As most relevant there, it includes aliens who have committed crimes of moral turpitude, 8 U.S.C. § 1182(a)(2)(A), *id.* § 1227(a)(2)(A)(i); crimes involving controlled substances, *id.* § 1182(a)(2)(A), *id.* § 1227(a)(2)(B); human trafficking, *id.* § 1182(a)(2)(H); money laundering, *id.* § 1182(a)(2)(I); aggravated felonies, *id.* § 1227(a)(2)(A)(iii); and specified firearms offenses, *id.* § 1227(a)(2)(C).

When an alien is arrested, either pursuant to DHS's discretion under § 1226(a) or, for criminal aliens, as commanded by Congress under § 1226(c), the alien is placed in removal proceedings before an immigration judge. If the alien is not a criminal alien, DHS has discretion to continue detention pending removal or to release the alien on bond or parole. *See* 8 U.S.C. § 1226(a)(1)–(2). If the alien is a criminal alien, DHS has no discretion to release the alien except under limited circumstances not implicated here. *See* 8 U.S.C. § 1226(c); *Preap*, 139 S. Ct. at 960.

Once an alien's rights are adjudicated and he is ordered removed, DHS "shall remove the alien from the United States within a period of 90 days." *See* 8 U.S.C. § 1231(a)(1)(A).

<u>State Cooperation with Federal Immigration Enforcement</u>

For decades, States like Florida have relied on the federal government's enforcement of and compliance with the INA in general and

§§ 1226(c) and 1231(a)(1)(A) in particular, especially after the Supreme Court clarified that States cannot "engage in" their own immigration "enforcement activities." *Arizona v. United States*, 567 U.S. 387, 410 (2012). Even though *Arizona* prevents Florida from taking matters into its own hands, *Arizona* also recognizes that "States . . . bear[] many of the consequences of unlawful immigration." *Id.* at 397. Nowhere are these consequences more obvious than when criminal aliens are released back into Florida's communities to reoffend rather than being removed from the country. In fact, according to former Acting Director of ICE Thomas Homan, the consequences can be "dire." Ex. 18 at 5–8.

The previous two administrations understood this reality. Under President Trump, any removable alien convicted of a crime or with pending criminal charges was a priority. Ex. 5 at 3. And although President Obama took a different approach to immigration enforcement overall, his administration agreed with the Trump Administration on the importance of immigration enforcement against criminals, including aliens who committed any felony, any "significant misdemeanor," such as "domestic violence," "sexual abuse or exploitation," "burglary," "unlawful possession or use of a firearm," "drug distribution or trafficking," and "driving under the influence," and aliens who were repeat offenders of even minor misdemeanors. Ex. 6 at 4–5.

Relying on these consistent efforts by the federal government to remove criminal aliens from Florida, and to do everything possible to ensure their efficacy, Florida passed Senate Bill 168 in 2019. It is codified in Chapter 908 of the Florida Statutes and requires all state and local officials to inform the federal government when they will release aliens from criminal custody, § 908.105, Fla. Stat.; *id.* § 908.102(6)(b); *id.* § 908.103, and even to detain those aliens pursuant to an immigration warrant if federal officials cannot arrive in time. § 908.105, Fla. Stat.; *id.* § 908.102(6)(a); *id.* § 908.103. Florida's sheriffs have also made significant efforts to facilitate cooperation with ICE, including 47 sheriffs' offices entering formal cooperation agreements. Ex. 7 at 7–11.

<u>The Biden Administration's Actions</u>

On January 20, 2021, the day he took office, President Biden issued Executive Order 13993, Revisions of Civil Immigration Enforcement Policies and Priorities, 86 Fed. Reg. 7051 (Jan. 20, 2021). That same day, DHS issued its stand-down order (the "January 20 Memo").

The memo does three things. *First*, it requires review of the federal government's existing immigration policies. Ex. 3 at 3. *Second*, under the guise of "interim enforcement priorities," the January 20 Memo orders DHS, effective February 1, to cease virtually all civil immigration enforcement except for removable aliens who came to the United States on or after

6

November 1, 2020. As to the removable aliens who are already here, they get a free pass unless they are a terrorist, a spy, or an aggravated felon whom DHS separately determines to be a public-safety risk. *Id.* at 3–4. *Third*, the memo orders "an immediate pause on removals of any noncitizen with a final order of removal" for 100 days, subject to narrow exceptions. *Id.* at 4.

On January 26, 2021, a district court in the Southern District of Texas entered a nationwide temporary restraining order against the 100-day stay of removals, and on February 23, the court converted it into a preliminary injunction. *Texas v. United States*, 2021 WL 723856, at *4, *53 (S.D. Tex. 2021).[3]

On February 18, ICE issued another stand-down order (the "February 18 Memo").[4] The February 18 Memo largely reiterates the "interim enforcement priorities." It clarifies that DHS "anticipates" issuing new guidelines after 90 more days, but that the January 20 and February 18 Memos are the authoritative, operative documents governing immigration enforcement unless DHS says otherwise. Ex. 4 at 2. The February 18 Memo also purports not to prohibit civil immigration enforcement actions against

---

[3] The "interim enforcement priorities" are not at issue in the Texas litigation.

[4] Because the 100-day stay of removals is enjoined nationwide, the February 18 Memo addresses only the "interim enforcement priorities." Ex. 4 at 3.

those who fall outside the "enforcement priorities," but it makes clear that, to do so, an ICE officer must submit a justification in writing and receive approval from the Field Office Director or Special Agent in Charge. *Id.* at 4, 6–7. The February 18 Memo, with the permission of DHS, also modifies the "interim enforcement guidelines" in one significant way. *Id.* at 2. It adds to the priority list removable aliens who are gang members, but only if ICE can prove that these gang members are furthering the illegal activity of the gang *and* determines them to be a "public safety" threat. *Id.* at 5–6.

Both memos try to justify these actions based on "limited resources" and the COVID-19 pandemic. Ex. 3 at 2; Ex. 4 at 3.

## LEGAL STANDARD

A plaintiff seeking a preliminary injunction must establish (1) "that he is likely to succeed on the merits," (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in his favor," and (4) "that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The Administrative Procedure Act ("APA"), 5 U.S.C. § 705, allows courts, in the alternative, to "postpone the effective date of an agency action." The standard is the same. *Texas v. EPA*, 829 F.3d 405, 435 (5th Cir. 2016).

## ARGUMENT

### I.   FLORIDA HAS STANDING AND WILL BE IRREPARABLY HARMED.

*a.  The memos will cause an increase in criminal aliens in Florida.*

As a result of the memos, ICE is refusing to take custody of scores of criminal aliens across the State—causing their release into Florida—and it will only get worse. The Florida Department of Corrections already reports seven instances of ICE refusing to take custody of serious criminals upon release from state custody. *See* Ex. 1; Ex. 2. According to emails from ICE to state officials, ICE is refusing to take custody of these aliens because they "do[] not meet the current interim civil immigration enforcement priorities issued on January 20, 2021." *See, e.g.*, Ex. 1 at 6.

The criminal activity of these seven aliens is disturbing. Several of them have multiple burglary convictions, Ex. 2, at 3, 6, 9, 12, including one who appears to have gone on a burglary spree. *Id.* at 9. Many also have serious drug convictions, including for cocaine and heroin trafficking. *Id.* at 6, 11–18.

And much of the State's cooperation with ICE goes on in local jails rather than in state prisons. In Pasco County alone—just 1 of Florida's 67 counties—ICE has already canceled detainers[5] for several aliens whose

---

[5] Detainers are ICE's request to be notified before an alien is released from criminal custody. Ex. 18 at 6.

crimes include domestic violence and violating a restraining order.[6] Ex. 16 at 3–4, 9, 20–21, 24.

Even extrapolating Pasco County's experience over Florida's other 66 counties would not fully capture the effect of the memos in Florida. The memos apply equally to federal inmates, and the federal inmate population in Florida includes another 8,801 criminals, Ex. 9 at 3–7, around 21% of which are aliens, Ex. 10 at 3. Moreover, almost 30% of ICE's civil immigration arrests—at least in fiscal year 2017—were at-large arrests. Ex. 18 at 6. As a result of the memos, criminal aliens who have already been released and are currently at-large in Florida will not be arrested and detained by ICE including, for example, the aliens "with sex crime convictions" who were the target of an enforcement operation that the Biden Administration recently abandoned. ECF No. 1 at ¶ 5 (citing source).

And the 100-day removal pause will further contribute to the release of criminal aliens into Florida's communities. *See Texas*, 2021 WL 723856, at *15. In fiscal year 2020, ICE's Miami office removed 7,046 aliens. Ex. 8 at 7. Of those, 3,476 were convicted criminals and 1,356 had pending criminal charges. *Id.* at 8–9. The longer an alien is detained following a final order of

---

[6] A third alien for whom a detainer was canceled was stopped for a traffic violation, but he was arrested because he has an outstanding warrant in Nebraska for molesting a child. Ex. 16 at 12–15.

removal, and the less certain his prospects of actual removal, the more likely it is that ICE will be required to release him. *See* Ex. 18 at 13; *Texas*, 2021 WL 723856, at *45 (discussing *Zadvydas v. Davis*, 533 U.S. 678, 683–84, 701 (2001)).

### b.  *An increase in criminal aliens will irreparably harm Florida.*

The memos' increasing the amount of criminal aliens in Florida will cause a wide variety of harms. Given the high recidivism rates among those released from state prison, *see* Ex. 11 at 2–3, it is a statistical certainty that the scores of released criminal aliens will commit additional crimes in Florida. Many are already repeat offenders. *See, e.g.*, Ex. 2 at 6, 12.

These crimes will cost the State tens of millions of dollars, if not more, and cause the State to expend considerable resources. Florida spends approximately $120 million a year incarcerating aliens at the state level alone. Ex. 13 at 4. Those costs will increase if scores of criminal aliens are released to commit further crimes. Moreover, when crimes are committed, Florida expends resources and money on law enforcement, Ex. 15, mental-health and substance-abuse treatment, Ex. 14 at 5–6, and crime victim's assistance, *id.* at 3–5; Ex. 12 at 21–26. Increased criminal activity will raise these costs, and the Biden Administration's creation of new crime victims will pull resources away from other pressing public-safety needs and other vulnerable crime victims.

These harms establish both standing and irreparable harm. Florida need only show either "economic injury" or that is has "expended . . . resources" because of the memos. *Chiles v. Thornburgh*, 865 F.2d 1197, 1208 (11th Cir. 1989). It has shown both. Further, the States are entitled to "special solicitude" in the standing context, *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007), especially for immigration, where States "bear[] many of the consequences of unlawful immigration" but lack authority to act on their own and are at the mercy of the federal government. *Arizona*, 567 U.S. at 397; *see DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020).

Moreover, Florida's threatened harm is irreparable. *See Texas*, 2021 WL 723856, at *48. Florida stands to suffer "injury in the form of millions of dollars of losses." *Texas v. United States*, 809 F.3d 134, 186 (5th Cir. 2015). These losses "cannot be undone through monetary remedies," *Ferrero v. Associated Materials Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991), because the United States has sovereign immunity, *Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013). And the crime caused by the memos causes further irreparable harm, including "criminal victimization," "continued exposure to a high crime rate," and "unsafe conditions." *Open Communities All. v. Carson*, 286 F. Supp. 3d 148, 175–76 (D.D.C. 2017).

Lest there be any doubt, Congress has already found that States like Florida are harmed by the release of criminal aliens into their communities.

One of the chief goals of § 1226(c) was to deal with criminal-alien recidivism, *Demore*, 538 U.S. at 518–19, and Congress has separately recognized the great cost to the States of criminal-alien crime. *See* 8 U.S.C. § 1231(i); *Texas*, 2021 WL 723856, at \*16–17; Ex. 13 at 3. These Congressional acts are thus "an implied finding that" the Biden Administration's statutory violations "will harm the public and ought [to] be restrained." *United States v. Diapulse Corp. of Am.*, 457 F.2d 25, 28 (2d Cir. 1972).

## II.   THIS COURT MAY REVIEW THE AGENCY ACTIONS IN THE MEMOS.

### a.  *The memos are subject to judicial review.*

The APA creates a "basic presumption of judicial review." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2567 (2019). "[A] very narrow exception" to that presumption exists, however, when an action is "committed to agency discretion by law." *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 410 (1971); 5 U.S.C. § 701(a)(2). This is not one of those "rare instances" because the statutes are not "drawn in such broad terms that . . . there is no law to apply." *Overton Park*, 401 U.S. at 410; *accord Forsyth Cty. v. U.S. Army Corps of Eng'rs*, 633 F.3d 1032, 1040–41 (11th Cir. 2011).

**1.** As to the "enforcement priorities," the challenged actions cannot be committed to agency discretion by law because the agencies do not have discretion to intentionally fail to arrest criminal aliens. That is the whole point of § 1226(c). Congress added it to "*subtract* some of th[e] discretion" DHS

possessed under § 1226(a)—specifically, the discretion not to "arrest . . . criminal aliens."[7] *Preap*, 139 S. Ct. at 966 (emphasis in original). Where, as here, Congress "has indicated an intent to circumscribe agency enforcement discretion, and has provided meaningful standards for defining the limits of that discretion, there is 'law to apply' under § 701(a)(2)" and so the agency actions are reviewable.[8] *Forsyth Cty.*, 633 F.3d at 1040 (citing *Heckler v. Chaney*, 470 U.S. 821, 834–35 (1985)); *see Preap*, 139 S. Ct. at 966 ("The Secretary *must* arrest those aliens guilty of a predicate offense." (emphasis in original)).

If Defendants argue otherwise, they are contradicting DHS's own position in *Preap* in the U.S. Supreme Court less than three years ago. *See* Br. of DHS 23 (arguing that, in § 1226(c), "Congress eliminated all discretion" for criminal aliens); Reply Br. of DHS 2 (discussing "[t]he Secretary's *duty* to arrest . . . criminal alien[s]" (emphasis added)).[9]

---

[7] The Court refers to "subtract[ing] *some* of th[e] discretion," *Preap*, 139 S. Ct. 966 (emphasis altered), because Congress did not subtract DHS's discretion with respect to non-criminal aliens, who are not governed by § 1226(c).

[8] *Chiles v. United States*, 69 F.3d 1094 (11th Cir. 1995), does not hold otherwise. That case addressed the general argument that the federal government was not "adequately guarding the borders." *Id.* at 1096. It did not address an argument that a federal agency was ignoring a specific statutory command and predated the enactment of § 1226(c).

[9] DHS's brief in the *Texas* case indicates that it has not changed positions. *See* Opp. to PI 3 (admitting that § 1226(a) detention is "discretionary" but § 1226(c) detention is "mandatory").

Finally, if Defendants invoke 8 U.S.C. § 1226(e), which limits judicial review of DHS's "discretionary judgment regarding the application of" § 1226, *Preap* forecloses that argument too. Section 1226(e) "applies only to 'discretionary' decisions about the 'application' of § 1226 to particular cases." *Preap*, 139 S. Ct. at 962. The agencies' decision, as a matter of nationwide policy, to intentionally flout § 1226(c) is neither "discretionary" nor an "application . . . to [a] particular case[]." *Id.*; *accord Jennings v. Rodriguez*, 138 S. Ct. 830, 841 (2018) (holding that § 1226(e) does not foreclose "challeng[es] [to] the extent of the Government's . . . authority under the statutory framework" of § 1226(c) (quotations omitted)).[10]

**2.** The 100-day pause ordered by the January 20 Memo also is "not an action committed to agency discretion." *Texas*, 2021 WL 723856, at *38. "[T]he text, context, statutory history, and precedent" show that § 1231(a)(1)(A) "unambiguously means" that the Government "*must* remove" aliens with final orders of removal within 90 days of those orders. *Id.* at 36, 38 (emphasis in original). No discretion thus exists to do otherwise.

**3.** Congress did not commit to the discretion of the agencies their decisions to ignore the clear commands of §§ 1226(c) and 1231(a)(1)(A). But

---

[10] The Court has taken the same approach with other similar provisions of the INA, including in APA cases. *See, e.g.*, *Regents*, 140 S. Ct. at 1907 (rejecting the argument that "two jurisdictional provisions of the INA [are] independent bars to review").

even if this Court disagrees, the Defendants' conduct is so "extreme as to amount to an abdication of [their] statutory responsibilities," and is reviewable on that ground alone. *See Heckler*, 470 U.S. at 833 n.4.

> b. *The memos are final agency action.*

The actions taken by the memos are final agency action. The memos "mark the consummation of the agency's decisionmaking process"—they are not "merely tentative or interlocutory." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1813 (2016). And they determine "rights or obligations . . . from which legal consequences will flow." *Id.* The memos are already having irreversible and significant consequences for Florida. *See supra* § I. And one court has already held that the January 20 Memo's 100-day stay of removals is final agency action. *Texas*, 2021 WL 723856, at *32. The "enforcement priorities" are for the same reasons.

DHS's and ICE's decision-making over the memos is over. The 100-day stay of removals went into effect "as soon as practical and no later than January 22," Ex. 3 at 4, and the "enforcement priorities" went into effect "February 1." *Id.* Moreover, while DHS has not offered further clarification on the 100-day stay of removals because of the *Texas* injunction, ICE has clarified that the "enforcement priorities" will remain in effect until DHS say otherwise, and that even the 90-day target is "anticipate[d]." Ex. 4 at 2. ICE has even

created a formal process for aliens who "believe they do not meet ICE's priorities" to "request a case review." Ex. 17 at 3.

The "interim" label does not alter this reality. No doubt Defendants hoped this label would allow their actions to evade judicial review, but during this indefinite "interim," the memos have the force of law. That an agency may "revise" its decision "is a common characteristic of agency action, and does not make an otherwise definitive decision nonfinal." *Hawkes Co.*, 136 S. Ct. at 1814. Indeed, "the mere possibility that an agency might reconsider . . . does not suffice to make an otherwise final agency action nonfinal." *Sackett v. EPA*, 566 U.S. 120, 127 (2012).

Consider the implications of holding otherwise. Defendants have staked out the position that they have discretion to ignore the clear commands of Congress, and they have started doing so, despite the harm that this will cause States like Florida—harm that Congress predicted and sought to guard against. Defendants have said that they might change their policy someday, but they haven't said when, or even committed to doing so at all. If the Defendants' conduct evades judicial review, it will provide a blueprint for how the executive branch can violate the law indefinitely without consequences.

### III.   FLORIDA IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS.

Florida satisfies this prong because it "is more likely than not to succeed . . . on the merits." *Jets Servs., Inc. v. Hoffman*, 420 F. Supp. 1300, 1307 (M.D. Fla. 1976).

#### a. *The memos violate the APA.*

Courts are not "rubber stamp[s]" for agencies, *In re Gateway Radiology Consultants, P.A.*, 983 F.3d 1239, 1263 (11th Cir. 2020), and must conduct a "searching and careful" review of agency action, *Sierra Club v. Johnson,* 436 F.3d 1269, 1273–74 (11th Cir. 2006). Under the APA, courts must "hold unlawful and set aside" agency action that is "in excess of statutory jurisdiction, authority, or limitations"; that is "not in accordance with law"; or that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A), (C). These are disjunctive, so "[e]ven when an administrative agency did not act 'in excess of statutory jurisdiction,' . . . it still may have acted arbitrarily and capriciously." *In re Gateway Radiology*, 983 F.3d at 1262–63.

The memos violate the APA because (1) they instruct DHS and ICE officers to ignore the clear commands of Congress in the INA—particularly 8 U.S.C. §§ 1226(c) and 1231(a)(1)(A); (2) they are arbitrary and capricious and do not reflect reasoned decision-making—especially in ignoring issues that the APA requires agencies to consider and in offering pretextual justifications; and

(3) the actions contemplated by the memos require notice and comment rulemaking.

           i. <u>The memos exceed DHS's and ICE's statutory authority and are not in accordance with law.</u>

DHS and ICE have "gone beyond what Congress has permitted [them] to do." *City of Arlington v. FCC*, 569 U.S. 290, 298 (2013). They have no "power to act unless and until Congress" gives it to them. *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 112 (2d Cir. 2018). And they are especially powerless to disregard express statutory commands. *League of Women Voters v. Newby*, 838 F.3d 1, 9–12 (D.C. Cir. 2016).

Moreover, while the executive branch sometimes enjoys broad discretion over immigration, that is not always the case. Rather, authority over immigration belongs to Congress, *see* U.S. Const. art. I, § 8, and executive discretion flows, in part, from "the vague and sweeping language employed by Congress." *Jean v. Nelson*, 727 F.2d 957, 967 (11th Cir. 1984). Therefore, where Congress instead uses specific, mandatory language, this broad discretion does not exist. *See id.* ("[E]xecutive officials function as agents of Congress in enforcing the law.").

**1.** Before 1996, Congress gave the agencies discretion to decide whether to arrest and detain aliens. But Congress, frustrated with the way the executive branch was exercising that discretion for criminal aliens, added

§ 1226(c)—changing the word "may" to "shall"—to withdraw that discretion and "obligat[e]" the agencies to arrest criminal aliens. *Preap*, 139 S. Ct. at 969; *see Jennings*, 138 S. Ct. at 844 ("Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement."); *accord Demore*, 538 U.S. at 513; *In re Rojas*, 23 I. & N. Dec. at 122.

The memos ignore this command in at least two ways. *First*, they limit DHS's and ICE's enforcement to terrorists, spies, aggravated felons, and certain gang members. Ex. 3 at 3; Ex. 4 at 5–6. But § 1226(c)'s commands apply to aliens who commit many other crimes, including crimes of moral turpitude, 8 U.S.C. § 1182(a)(2)(A), *id.* § 1227(a)(2)(A)(i); crimes involving controlled substances, *id.* § 1182(a)(2)(A), *id.* § 1227(a)(2)(B); human trafficking, *id.* § 1182(a)(2)(H); money laundering, *id.* § 1182(a)(2)(I); and specified firearms offenses, *id.* § 1227(a)(2)(C). The memos ignore these crimes.[11] *Second*, even for aggravated felons and specified gang members, the memos require a separate public-safety analysis, which contradicts the mandatory nature of § 1226(c).[12] Ex. 3 at 3; Ex. 4 at 5–6.

---

[11] In fact, in focusing on aggravated felonies, the agencies are essentially reverting back to the pre-1996 version, then codified in § 1252(a)(2)(A). *See supra* note 2.

[12] The memos' problem is not limited to criminal aliens who are due to be released from jail or prison. DHS is obligated to arrest at-large criminal aliens when it becomes aware of them. *See Preap*, 139 S. Ct. at 967 ("[C]rucial duties are better carried out late than never.").

In other words, despite § 1226(c)'s quarter-century existence, the agencies now claim to have "discover[ed] . . . an unheralded power." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014). More problematic still, that "discovered" power is the precise one that Congress took away in 1996.

Finally, it is no answer to argue, as Defendants are sure to do, that the memos do not actually forbid immigration enforcement against other categories of aliens, but merely require a written justification and approval by the Field Office Director or Special Agent in Charge. *First*, the mere requirement of written justification and approval contemplates that approval will sometimes be denied, which violates § 1226(c) for the reasons explained above. *Second*, as former Acting ICE Director Homan explains in his declaration, obtaining that approval is infeasible, and requiring it is a transparent attempt to obscure the true nature of the memos as a prohibition on "non-priority" enforcement. Ex. 18 at 11. Moreover, the record reflects that the agencies are treating the memos as a prohibition. *See* Ex. 1.

**2.** And for the same reasons that the 100-day pause is not committed to agency discretion, *supra* § II.a, it exceeds DHS's statutory authority. *See* 8 U.S.C. § 1231(a)(1)(A); *Texas*, 2021 WL 723856, at *39 (so holding).

ii.   The memos are arbitrary and capricious.

DHS failed to provide adequate reasoning behind the factors it purported to consider, *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016),

pointed to pretextual reasons, *Commerce*, 139 S. Ct. at 2573–74, ignored important aspects of the problem, *Michigan v. EPA*, 576 U.S. 743, 751–53, 759–60 (2015), and failed to justify its departing from the decades-old policy by considering lesser alternatives and reliance interests, *Regents*, 140 S. Ct. at 1913; *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Its actions therefore are arbitrary and capricious and should be set aside. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

*First*, DHS and ICE "point[ed] . . . to [no] data," *Nat'l Treasury Emps. Union v. Horner*, 854 F.2d 490, 499 (D.C. Cir. 1988), to "explain why" they took the actions in the memos, *State Farm*, 463 U.S. at 48. The agencies asserted that limited resources and COVID-19 justified their actions, but provided no evidence to support that argument, particularly evidence as to why the other laws the federal government enforces can continue but immigration enforcement must cease. *See Tripoli Rocketry Ass'n, v. ATF*, 437 F.3d 75, 77 (D.C. Cir. 2006) (vacating agency action due to lack of supporting evidence).

*Second*, and relatedly, the reasons DHS and ICE did provide were pretextual.[13] *See Commerce*, 139 S. Ct. at 2573–74. As President Biden's press secretary has admitted, the reason for the memos is that the Biden

---

[13] Florida's position is that the Court should decide its preliminary injunction motion without discovery. If the Court grants Defendants discovery, however, Florida reserves its right to seek discovery in support of its pretext argument.

Administration *does not want* to enforce the immigration laws, not that it *can't*. ECF No. 1 at ¶ 5 (citing source); Ex. 18 at 13–14.

*Third*, DHS and ICE ignored an important aspect of the problem: the massive costs imposed by its actions, including on States like Florida. These are "a centrally relevant factor when deciding whether to regulate." *Michigan*, 576 U.S. at 752–53. The memos do not mention costs at all.

*Fourth*, DHS failed to explain its "extreme departure from prior practice," *E. Bay Sanctuary Covenant v. Trump*, 349 F. Supp. 3d 838, 858 (N.D. Cal. 2018), as required by the APA, *Regents*, 140 S. Ct. at 1913. The memos barely even "display awareness that [DHS] *is* changing position." *Fox Television*, 556 U.S. at 515 (emphasis in original). And DHS ignored lesser alternatives to its extreme departure that would still fall within the ambit of the Obama and Trump Administrations' approach. Ex. 5 at 3; Ex. 6 at 4–5. DHS also ignored the reliance interests of States like Florida. Florida has relied on the federal government for decades to protect it from criminal-alien crime, including enacting an entire statutory scheme in support of the federal government's practices, *see* Ch. 908, Fla. Stat., and entering into dozens of agreements with the federal government. Ex. 7 at 7–11. "Ignor[ing]" these reliance interests and failing to consider lesser alternatives is "arbitrary and capricious." *Regents*, 140 S. Ct. at 1913.

iii. _DHS and ICE failed to provide notice and comment._

The APA required DHS and ICE to provide notice of, and comment on, the memos because they are substantive rules that "affect individual rights and obligations." _Chrysler Corp. v. Brown_, 441 U.S. 281, 303 (1979); _see_ 5 U.S.C. § 553(b)–(d). One court has already held that the 100-day pause on removals required notice and comment, _Texas_, 2021 WL 723856, at *43–48, and the "enforcement priorities" do for the same reasons. _See also, supra_ § II.b.

The Eleventh Circuit has held that federal immigration officials must engage in rulemaking when changing a policy to detain _more_ aliens. _Jean v. Nelson_, 711 F.2d 1455, 1469, 1476, 1478 (11th Cir. 1983). Changing a decades-old policy to detain _less_ aliens (or to remove less aliens)—especially when doing so violates clear statutory commands—is no different.

b. _Compliance with the memos violates §§ 1226(c) and 1231(a)(1)(A) and the Constitution._

Even if Florida's claims were unreviewable under the APA—and they are not—Florida remains entitled to an injunction. _See Osborn v. Bank of U.S._, 22 U.S. 738 (1824). The memos require action that contradicts statutory mandates from Congress explicitly to the executive branch, and this Court should enjoin the memos for that reason alone. _See Texas_, 2021 WL 723856, at *38 ("[T]he Defendants substantially undervalue the People's grant of 'legislative Powers' to Congress."); _see_ ECF No. 1 at ¶¶ 88–101.

24

IV.   **THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST FAVOR PRELIMINARY INJUNCTIVE RELIEF.**

The equities and public-interest factors merge for federal-government action. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Both favor an injunction here. "[T]he public interest in enforcement of the immigration laws is significant." *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d. 1211, 1221 (D.C. Cir. 1981). Thus, "[t]here is always a public interest in prompt execution of removal orders," especially if "the alien is particularly dangerous." *Nken*, 556 U.S. at 436. And "[f]orcing federal agencies to comply with the law is undoubtedly in the public interest." *Cent. United Life., Inc. v. Burwell*, 128 F. Supp. 3d 321, 330 (D.D.C. 2015). This, combined with the "public safety nightmare" created by the memos, Ex. 18 at 9, far outweighs any harm to Defendants.

V.   **NO BOND IS REQUIRED UNDER RULE 65(c).**

"[T]he amount of security . . . is a matter within the discretion of the trial court." *BellSouth Telecomm. v. MCIMetro Access Transmission Servs.*, 425 F.3d 964, 971 (11th Cir. 2005); *see Texas*, 2021 WL 723856, at *53 (holding, on similar facts, that no security was required).

## CONCLUSION

For the foregoing reasons, the Court should grant Florida's motion for a preliminary injunction or, in the alternative, postpone the effective date of the memos during the pendency of this case.

Respectfully submitted,

Ashley Moody
ATTORNEY GENERAL

John Guard
CHIEF DEPUTY ATTORNEY GENERAL

*/s/ James H. Percival*
James H. Percival* (FBN 1016188)
CHIEF DEPUTY SOLICITOR GENERAL
*Lead Counsel

Jason H. Hilborn (FBN 1008829)
ASSISTANT SOLICITOR GENERAL

Anita Patel (FBN 70214)
SENIOR ASSISTANT ATTORNEY GENERAL

Rachel Kamoutsas (FBN 106869)
DEPUTY GENERAL COUNSEL

Office of the Attorney General
The Capitol, PL-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
james.percival@myfloridalegal.com

*Counsel for the State of Florida*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 9th day of March, 2021, a true and correct copy of the foregoing was filed with the Court's CM/ECF system and furnished by U.S. Mail to:

U.S. Department of Justice
Justice Management Division
950 Pennsylvania Avenue, NW
Room 1111
Washington, DC 20530

United States Attorney's Office
Middle District of Florida
400 N. Tampa St., Suite 3200
Tampa, FL 33602

U.S. Customs and Border Protection
Office of Chief Counsel
1300 Pennsylvania Avenue
Suite 4.4-B
Washington, D.C. 20229
CBP-Service-Intake@cbp.dhs.gov

Troy Miller
Acting Commissioner
U.S. Customs and Border Protection
Office of Chief Counsel
1300 Pennsylvania Avenue
Suite 4.4-B
Washington, D.C. 20229
CBP-Service-Intake@cbp.dhs.gov

U.S. Citizenship and Immigration
Services
Office of the Chief Counsel
20 Massachusetts Ave. NW
Room 4210
Washington, DC 20529
uscis.serviceofprocess@uscis.dhs.gov

Tracy Renaud
Acting Director
U.S. Citizenship and Immigration
Services
Office of the Chief Counsel
20 Massachusetts Ave. NW
Room 4210
Washington, DC 20529
uscis.serviceofprocess@uscis.dhs.gov

U.S. Dept. of Homeland Security
Office of the General Counsel
2707 Martin Luther King Jr. Ave SE
Washington, DC 20528-0485
OGC@hq.dhs.gov

The Honorable Alejandro Mayorkas
Secretary of Homeland Security
U.S. Dept. of Homeland Security
Office of the General Counsel
2707 Martin Luther King Jr. Ave SE
Washington, DC 20528-0485
OGC@hq.dhs.gov

U.S. Immigration and Customs Enforcement
Office of the Principal Legal Advisor
500 12th St. S.W., Mail Stop 5900
Washington, DC 20536-5900
OPLAServiceIntake@ice.dhs.gov

Tae Johnson
Acting Director
U.S. Immigration and Customs Enforcement
Office of the Principal Legal Advisor
500 12th St. S.W., Mail Stop 5900
Washington, DC 20536-5900
OPLAServiceIntake@ice.dhs.gov

/s/ *James H. Percival*
James H. Percival