# EXHIBIT 18

Exhibit 18 - 001

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

STATE OF FLORIDA,

    *Plaintiff,*

    v.

Case No. _____

The UNITED STATES OF AMERICA;
*et al.,*

    *Defendants.*

_____/

## DECLARATION OF THOMAS HOMAN

I, Thomas Homan, hereby declare:

### Background and Experience

1. I make this declaration on the basis of my own personal and professional knowledge and experience, information available to me in my positions in public service, and publicly available information.

2. I am the former Acting Director of the U.S. Immigration and Customs Enforcement ("ICE"), U.S. Department of Homeland Security ("DHS"), a position I held from January 2017 to June 30, 2018.

3. I have over thirty-two years of experience working for ICE and its predecessor entity, the Immigration and Naturalization Service ("INS").

4. I hold a Bachelor of Science degree in Criminal Justice from the State University of New York Polytechnic Institute (formerly "SUNYIT") at Utica-Rome.

5. I am a 34-year veteran of law enforcement, having begun my career as a police officer in New York in 1983. In 1984, I became a U.S. Border Patrol Agent with the former INS in Campo, California. In 1988, I became an INS Special Agent in Phoenix, Arizona, and was later promoted to Supervisory Special Agent and Deputy Assistant Director for Investigations. In 1999, I

Exhibit 18 - 002

became the Assistant District Director for Investigations ("ADDI") in San Antonio, Texas, and three years later transferred to the ADDI position in Dallas, Texas.

6. The INS was abolished by the Homeland Security Act of 2002, and ICE was created to perform many of INS's former enforcement functions, along with the investigative functions of the former U.S. Customs Service. *See* 6 U.S.C. § 252.

7. Upon the creation of ICE in March 2003, I was named the Assistant Special Agent in Charge in Dallas, Texas. In August 2004, I was named the Deputy Special Agent in Charge ("DSAC") in that same office. As DSAC, I directed the day-to-day operations of seven local offices, with more than 200 special agents and support personnel, conducting investigations related to terrorism, export enforcement, illicit financing, money laundering, human trafficking, intellectual property rights violations, and cybercrimes.

8. In March of 2009, I became Enforcement and Removal Operations ("ERO") Assistant Director for Enforcement at ICE Headquarters. In that position, I was responsible for ICE's enforcement initiatives and components through which ERO identifies and arrests removable aliens, including the Criminal Alien Program, the National Fugitive Operations Program, Field Training, the 287(g) Program, the Law Enforcement Support Center ("LESC"), the Fugitive Operations Support Center (now the National Criminal Analysis and Targeting Center ("NCATC")), the Detainee Enforcement and Processing Offenders by Remote Technology Center, and the Interoperability Response Centers. In October of the following year, I was promoted to Deputy Executive Associate Director for ERO. In 2015, I was given the Presidential Rank award from President Obama. I was promoted to Executive Associate Director for ERO, a position I held until January 2017.

9. From November 2017 to 2018, I held the position of Deputy Director and Senior Official Performing the Duties of the Director of ICE. From January 2017 until June 30, 2018, I served as Acting Director of ICE. In both positions, I directly oversaw ICE's core operational programs, as well as the agency's managerial and administrative support functions. I also directed and oversaw ICE's day-to-day work of enforcing the nation's immigration and customs laws; investigating a wide range of domestic and international activities arising from the illegal movement of people and goods into, within, and outside of the United States and supporting the government litigators who prosecute exclusion, deportation, and removal proceedings, including against national security threats, criminal aliens, and other aliens posing a

Exhibit 18 - 003

threat to public safety. ICE employs more than 20,000 federal civil servants and contract staff in more than 400 offices within the United States and 50 foreign countries.

## Immigrations and Customs Enforcement Operations

10. ICE is the largest investigative branch of DHS and is charged with the enforcement of more than 400 federal statutes. ICE's mission is to protect America from the cross-border crime and illegal immigration that threaten national security and public safety through enforcement of the federal laws governing border control, customs, trade, and immigration to promote homeland security and public safety. To carry out that mission, ICE focuses on enforcing immigration law, preventing terrorism, and combating transnational criminal threats.

11. Homeland Security Investigations ("HSI"), one of ICE's core operational directorates, employs ICE's special agents, who are both immigration officers under 8 U.S.C. § 1357 and customs officers under 19 U.S.C. § 1589a. They are charged with investigating criminal and civil violations of the federal customs and immigration laws.

12. HSI consists of more than 10,400 employees, of which more than 7,100 are special agents, assigned to more than 225 cities throughout the United States and 53 countries around the world.

13. In my final full year with ICE, fiscal year ("FY") 2017, HSI made 32,958 criminal arrests; arrested 4,818 gang members, including 796 MS-13 members; seized $56 million in bulk cash; identified or rescued 904 child-exploitation victims and 518 human-trafficking victims; and seized 981,586 pounds of narcotics, including 2,370 pounds of fentanyl and 6,967 pounds of heroin. HSI operations in California alone accounted for 4,767 criminal arrests, identifications or rescues of 62 child exploitation victims and 204 human trafficking victims, and seizures of 238,224 pounds of narcotics, including 4,072 pounds of fentanyl and heroin.

14. HSI special agents handling national security and counterterrorism issues participate in Joint Terrorism Task Forces ("JTTFs") throughout the country, working closely with federal, state, and local law enforcement agencies to investigate and eradicate terrorist networks. They also work with the U.S. Department of State to ensure that individuals who pose a security risk are not issued U.S. visas and to investigate those believed to have violated the terms of their admission to the United States. HSI also monitors



**Exhibit 18 - 004**

schools, nonimmigrant students, and exchange visitors to ensure that legitimate students, researchers, and exchange visitors are welcomed while those who seek to harm the United States are excluded.

15. HSI works with other federal and foreign law enforcement agencies on investigations targeting transnational organized crime. HSI also conducts investigations related to bulk cash smuggling, commercial fraud, and other financial crimes, as well as worksite violations, immigrant document fraud, benefit fraud, and cybercrime.

16. Key to all HSI investigations is close collaboration with other federal, state, and local partners, from information-sharing to complex joint operations. A global law enforcement mission that spans so many investigative disciplines cannot be advanced without institutional partners.

17. ERO, another core ICE operational directorate, consists of more than 8,500 employees, including more than 6,100 deportation officers assigned to 24 ERO field offices and overseas locations in 20 countries. ERO deportation officers are immigration officers under 8 U.S.C. § 1357 and possess limited delegated customs officer authority under 19 U.S.C. § 1589a. It is the mission of ERO to identify, arrest, and remove aliens who present a danger to national security or are a risk to public safety, as well as those who enter the United States illegally—including those who cross the border illegally, a federal misdemeanor, 8 U.S.C. § 1325, and those who illegally reenter after having been removed, a federal felony, 8 U.S.C. § 1326—or otherwise undermine the integrity of our immigration laws and our border control efforts.

18. While ERO has significant assets near the border, most of its immigration enforcement operations take place in the interior of the country. ERO manages all logistical aspects of the removal process by identifying, apprehending, and, when appropriate, detaining removable aliens during the course of immigration proceedings and pending physical removal from the United States. This includes locating and taking into custody fugitive aliens and at-large criminal aliens, as well as identifying aliens in federal, state, and local prisons and jails and working with those authorities to transfer them to ICE custody without releasing them into the community. When aliens are ordered removed, ERO is responsible for safely repatriating them, or otherwise overseeing their departure from the United States.

19. To accomplish ICE's immigration-enforcement objectives, ERO coordinates closely with law enforcement partners within the United States

Exhibit 18 - 005

and around the world. One of the most notable law enforcement coordination and partnership efforts within ERO is the 287(g) Program, which involves the identification of aliens who are incarcerated within state and local prisons and jails. This program enables a state or local law enforcement entity to receive delegated immigration officer authority, training, and technology resources for immigration enforcement under the oversight and direction of ICE.

20. ERO enhances multi-agency task forces through its authority to administratively arrest removable aliens who threaten public safety and national security.

21. Acting principally through ERO (both through its Pacific Enforcement Response Center and its 24 field offices across the country), ICE issues immigration detainers to federal, state, and local law enforcement agencies to provide notice of its intent to assume custody, at the time of their release from state or local custody, of aliens detained in these agencies' custody, based on their violation of federal immigration law. In 2017, in California alone, ICE issued over 35,000 detainers. Detainers request that the law enforcement agency in whose custody the alien is currently held provide advance notification of the alien's release to allow for an orderly transfer of the individual into ICE custody and maintain custody of the alien for up to 48 hours after the time he or she would otherwise have been released so that ICE may respond to the prison or jail and assume custody. That number is a significant percentage of the 142,356 detainers issued by ICE nationwide during the same time period.

22. In FY 2017, ERO conducted 143,470 administrative arrests, 105,736 of which were of aliens with at least one known criminal conviction and 22,256 of which were for aliens with a pending criminal charge at the time of arrest. Of these arrests, 40,666 were conducted at-large, meaning that the arrest did not occur in a custodial setting such as a prison or jail.

**Consequences of ICE's Failure to Take Custody of Criminal Aliens**

23. When ICE is unable to take custody of criminal aliens—either because ICE is unable to take custody at the time aliens are released from criminal custody or because ICE is unable to engage in at-large enforcement actions— the consequences for state and local governments and their citizens are often dire. Recidivism rates are high, and criminal aliens who are allowed to return to communities commit additional crimes.



**Exhibit 18 - 006**

24. Due to my time at ICE, I am aware of several examples where law enforcement in California did not cooperate with ICE, leading to horrible consequences.

a. On September 1, 2017, ICE lodged a detainer with the San Francisco County Jail ("SFCJ") for a criminal alien detained on the charge of petty theft. The SFCJ released the criminal alien without providing ICE advance notification of release. After his release, on December 6, 2017, he was arrested for first-degree murder, second-degree robbery, and participating in a criminal gang.

b. On August 2, 2017, the Santa Rosa Police Department arrested a previously removed criminal alien on the charge of inflicting bodily injury on a spouse/cohabitant and booked him into the Sonoma County Jail ("SCJ"). On the same day, ICE lodged a detainer with the SCJ. SCJ released the criminal alien from custody without providing ICE an opportunity to assume custody. Approximately two weeks after his release by SCJ, the alien was re-arrested for second-degree murder.

c. On May 24, 2017, the San Francisco Police Department ("SFPD") arrested a criminal alien who illegally entered the United States in 2013 on charges of marijuana sales, conspiracy to commit crime, and possession of brass knuckles. The SFPD booked the criminal alien into the SFCJ. The next day, ICE lodged a detainer. The SFCJ subsequently released the alien without notifying ICE. On September 11, 2017, SFPD arrested the same criminal alien and booked him into the SFCJ on charges of second-degree burglary, three counts of robbery in the first degree, conspiracy to commit crime, and accessory to commit a crime.

d. On June 20, 2015, ICE lodged a detainer with the Buena Park Police Department on a criminal alien following his arrest for driving under the influence. The criminal alien had been removed from the United States on two prior occasions and had prior criminal convictions for cruelty to a child, infliction of corporal injury on a spouse or cohabitant, damage to power lines, DUI, spousal battery, and violation of a protective order. The detainer was not honored, and the

Page 6 of 13

**Exhibit 18 - 007**

criminal alien was released back into the community. On February 18, 2018, the criminal alien was arrested for homicide after he struck and killed a six-year old girl while driving under the influence and then tried to leave the scene.

**The January 20 and February 18 Memos**

25. I have reviewed the memorandum issued by then-Acting DHS Secretary David Pekoske dated January 20, 2021 (the "January 20 Memo") and the memorandum issued by Acting ICE Director Tae Johnson on February 18, 2021 (the "February 18 Memo").

26. Other than requiring an internal review of DHS policies, I understand the memos to do two things. *First*, the January 20 Memo and February 18 Memo create a narrow list of civil immigration "enforcement priorities" which, in reality, create a moratorium on civil enforcement actions that do not fall within those narrow enforcement priorities. As a result, the vast majority of the civil immigration enforcement that ICE does is now prohibited. *Second*, the January 20 Memo creates a 100-day stay of removals with narrow exceptions. This includes aliens who have already been accorded due process and were ordered to be removed by an immigration judge following a hearing.

The "Enforcement Priorities"

27. As to the "enforcement priorities," the January 20 Memo designates three categories:

a. Individuals who have engaged in or are suspected of terrorism or espionage, or whose apprehension, arrest and/or custody is otherwise necessary to protect the national security of the United States; or

b. Individuals apprehended at the border or ports of entry while attempting to unlawfully enter the United States on or after November 1, 2020, or who were not physically present in the United States before November 1, 2020; or

c. Individuals incarcerated within federal, state, and local prisons and jails released on or after the issuance of this memorandum who have been convicted of an "aggravated felony," as that term is defined in section 101(a)(43) of the

Exhibit 18 - 008

Immigration and Nationality Act at the time of conviction and are determined to pose a threat to public safety.

28. The February 18 Memo adds a fourth category:

    a. Individuals who are determined to pose a public safety risk and have been convicted of an offense for which an element was active participation in a criminal street gang, as defined in 18 U.S.C. § 521(a), or is not younger than 16 years of age and intentionally participated in an organized criminal gang or transnational criminal organization to further the illegal activity of the gang or transnational criminal organization.

29. For aliens falling under the aggravated felon or gang participation categories, a separate analysis is required to determine if the person is a public safety threat. To make this determination, officers are to consider a variety of so-called "mitigating factors," such as family circumstances and ties to the community.

30. For any civil immigration enforcement action that does not meet the above criteria, "preapproval" from the Field Office Director ("FOD") or Special Agent in Charge ("SAC") is required. And if officers encounter "non-priority" aliens during the course of an approved or priority operation, they may not take action.

31. In my view, based on decades of experience, these "enforcement priorities" are a public safety nightmare. They direct immigration officers to stop performing their statutory duties in the vast majority of cases.

32. Putting aside that committing an aggravated felony, alone, is not enough under the memos to warrant arrest, many serious crimes do not qualify as aggravated felonies. Below are just a few non-exhaustive examples:

    a. Domestic violence, as well as other assaults and batteries, are sometimes not aggravated felonies. I am concerned that, because of these memos, there will be more crimes of domestic violence. I am also concerned that victims of domestic violence who are caught in a cycle of violence will have a more difficult time escaping from their dangerous partners.



**Exhibit 18 - 009**

b. Drunk driving is often not an aggravated felony, and my understanding is that the recidivism rate for drunk drivers is high. It is my belief that the failure to remove criminal aliens who drive drunk from the country will lead to more drunk driving. I have personally met many mothers whose children were killed by criminal aliens who decided to get behind the wheel of a car while under the influence of drugs or alcohol.

c. Many drug-related crimes are not aggravated felonies. And because drug traffickers are frequently only convicted of possession or other lesser charges, I am concerned that ICE officers will have a more difficult time removing drug traffickers from the country.

d. Many theft and other property-related crimes are not aggravated felonies. I am concerned that the January 20 Memo and February 18 Memo will lead to more of these crimes.

33. When I read the January 20 Memo, one of the most significant concerns I had was with ICE being unable to continue its significant efforts to remove members of dangerous gangs like MS-13. ICE often works with partners at the federal, state, and local level in gang task forces and, where removable aliens are known to be members of these gangs but the task forces do not have enough evidence to bring criminal charges, ICE can take these individuals into custody for removal.

34. The February 18 Memo purports to address this concern, but in my view, it does not do so adequately. In most cases, a gang member does not have a prior conviction where active participation in a gang is an element. And in many cases, ICE does not have specific evidence about the precise illegal activity a gang member is advancing on behalf of the gang. In my view, membership in a gang like MS-13—which is a violent transnational gang responsible for countless murders and other illegal activity—is sufficient reason, alone, to remove someone from the country. I believe that the memos will severely hinder ICE's ability to address gang activity.

35. Even with respect to aggravated felonies, I have at least two concerns with respect to the January 20 and February 18 Memos.

a. First, a person must be convicted to be an enforcement priority. Often a person is charged and then released from

Exhibit 18 - 010



criminal custody. Under these circumstances, ICE takes custody of the person at the time of release from the local jail to ensure he does not abscond and commit further crimes. The additional requirement that a person be convicted before they are an enforcement priority will cause even aggravated felons to evade ICE.

b. Second, I cannot think of a rational reason why a separate "public safety" analysis is required when a person is already an aggravated felon. It is hard for me to imagine cases where allowing an aggravated felon to remain in the country is not a public safety issue and the memos offer no explanation for their contrary conclusion.

36. I am also aware that the February 18 Memo states that it does not forbid enforcement actions that are not priorities, but only requires approval by the FOD or SAC. As someone who spent decades working for DHS and its predecessor, INS, this exception is meaningless and the practical impact of these memos will be to prohibit civil immigration enforcement that is not considered a "priority."

37. FOD, or Field Office Director, describes the head of the ERO field office, and SAC, or Special Agent in Charge, describes the head of the HSI field office. In Florida, for example, the FOD of the Miami field office is in charge of all ICE ERO agents in the State of Florida.

38. As one of the largest ERO field offices, I estimate that hundreds of officers are under the authority of the Miami FOD. Running a field office of that size is more than a full-time job. When I held significant management positions within DHS, I often worked 12 hours a day or longer. Moreover, ICE officers often have to make judgments within hours or even minutes as to whether to take an enforcement action. For example, an ICE officer might become aware that a criminal alien is being released from criminal custody and have hours (or less) to determine whether to issue a detainer. Or an ICE officer might encounter a criminal alien during an enforcement operation and have only a moment to decide whether to make an arrest before the alien absconds. Thus, requiring pre-approval of the FOD—who, as mentioned, is likely already working very long hours just running the field office—is, in my view, a transparent attempt to create the appearance that civil immigration enforcement against aliens that are not a "priority" is still permissible, when for all practical purposes it is not.

Exhibit 18 - 011

## The 100-Day Stay of Removals

39. As to the 100-day stay of removals, the January 20 Memo effectively ordered a halt on nearly all deportations, including as to those whose removal was ordered following a full hearing and those who do not claim to be entitled to further immigration benefits. The cessation of removals applies to any noncitizen present in the United States with a final order of removal except one who falls under one of four narrow exceptions:

    a. According to a written finding by the Director of ICE, has engaged in or is suspected of terrorism or espionage, or otherwise poses a danger to the national security of the United States; or

    b. Was not physically present in the United States before November 1, 2020; or

    c. Has voluntarily agreed to waive any rights to remain in the United States, provided that he or she has been made fully aware of the consequences of waiver and has been given a meaningful opportunity to access counsel prior to signing the waiver; or

    d. For whom the Acting Director of ICE, following consultation with the General Counsel, makes an individualized determination that removal is required by law.

40. In my view, the 100-day pause on removals is a policy that will have disastrous consequences. It will cause near total cessation of removals of aliens who have already been through the adjudication process and deemed subject to removal. The pause will also severely disrupt ICE operations.

41. The list of exceptions contained in the January 20 Memo is extremely narrow. Aliens that have engaged in or are suspected of terrorism or espionage make up only a small fraction of criminal offenses committed by aliens typically subject to a removal order. Additionally, in my experience few aliens subject to a final order of removal voluntarily agree to waive their rights to remain in the United States. Finally, with hundreds of thousands of removals occurring each year in the United States, there are few cases that can reasonably be addressed through an "individualized determination" by both the Acting Director of ICE and General Counsel of ICE. Thus, the



**Exhibit 18 - 012**

exceptions provided do little to counteract the sweeping pause on removals of aliens with final orders of removal.

42. Notably absent from the narrow list of exceptions are aliens who have been issued a final order of removal and have been charged or convicted of a serious misdemeanor or felony. As a result of this omission, aliens who may have served their sentence or term of confinement in jail or prison could not be removed during the pause, except in the rare circumstances.

43. In FY 2020, alone, ICE removed 185,884 aliens. Of those, 103,762 were convicted criminals and another 15,187 had pending criminal charges. (These numbers were even higher pre-COVID.) Of those, 4,276 were known or suspected gang members and 31 were known or suspected terrorists. Under the January 20 Memo, it appears that only the 31 known or suspected terrorists would have been removed.

44. Based on my experience and review of the data, it is my opinion that the removal pause contained within the January 20 Memo will not only delay removals, but will almost certainly result in the release of aliens who have been charged or convicted of crimes from ICE custody.

45. Section 1231(a)(1)(A) requires ICE to detain illegal aliens for up to 90 days after the entry of a final order of removal. However, after that 90 days has elapsed, Section 1231(a)(6) says that the alien "may" be detained, and only if he or she is "determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal."

46. Additionally, detentions cannot go on indefinitely. In fact, generally an alien must be released if there is not a "significant likelihood of removal in the reasonably foreseeable future," commonly referred to as "SLRFF." My concern is that the 100-day deportation pause would call into question the likelihood of removal for the vast majority of removable aliens, including the thousands of convicted criminals currently in ICE's custody.

## Conclusion

47. I wish to address the rationale given for the January 20 and February 18 Memos. The memos state that DHS is resource constrained. I do not believe this to be the case and I believe that these reasons are being given as pretext. Based on my experience, the only plausible explanation for the memos is that the Biden Administration disagrees with the immigration laws, as enacted by Congress.

Exhibit 18 - 013

48. In FY 2012, ICE removed 409,849 aliens. Whereas in FY 2020, ICE removed only 185,884 aliens. (This drastic decline is not just the result of COVID, as ICE removed only 267,258 aliens in FY 2019.) During that same time period, ICE's budget authority grew to $10 billion, having been only $5.8 billion in FY 2012. In other words, ICE is removing substantially fewer aliens and has access to substantially more resources. Based on my experience, I expect that ICE officers are not only *not* resource constrained, but currently sitting on their hands due to the Biden Administration's policies.

49. The Biden Administration's January 20 and February 18 Memos will dramatically reduce efforts to stem the flow of illegal immigration and its consequences, including the contraband that travels across our borders and the illegal activity of criminal aliens. They create confusion as to what laws apply and when. They communicate to illegal immigrants and would-be illegal immigrants that the United States does not intend to proceed in earnest with immigration efforts. The memos also communicate information to ICE enforcement agents that is contrary to the laws enacted by Congress.

50. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____ 5/6/21

Date

_____

Thomas Homan

**Exhibit 18 - 014**