# Exhibit 1

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**STATE OF FLORIDA,**

    Plaintiff,

v.

**UNITED STATES OF AMERICA, et al.**

    Defendants.

Case No. 21-cv-541

**RESPONSE TO PLAINTIFF'S MOTION
FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

BACKGROUND ...................................................................................................2

I.   Statutory framework............................................................................................2

II.  New guidance memoranda concerning immigration enforcement. .....................3

III. Litigation history.................................................................................................6

STANDARD OF REVIEW .....................................................................................7

ARGUMENT ..........................................................................................................7

I.   Florida fails to establish a non-speculative injury, and thus it both lacks
     standing and cannot show irreparable harm. ......................................................7

II.  APA. ...................................................................................................................10

     a.   Florida cannot clear four threshold obstacles to its APA claims...............10

          i.   The challenged actions are committed to agency discretion. ..........11

          ii.  The challenged actions are not "final agency action" under
               the APA. ..........................................................................................14

          iii. Congress has precluded judicial review of these types of
               decisions. .......................................................................................15

          iv.  Florida cannot challenge the DHS Memo's removal pause
               because it does not fall within the relevant zone of interests...........17

     b.   Florida's APA claims fail on the merits. .................................................17

          i.   The Priority Framework is not contrary to law. ............................17

          ii.  The Priority Framework is not arbitrary and capricious.................21

III. Florida's notice-and-comment challenge fails. .................................................24

IV.  The balance of equities and public interest disfavor a preliminary
     injunction. .........................................................................................................25

CONCLUSION.......................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*Arizona Dream Act Coal. v. Brewer,*
  855 F.3d 957 (9th Cir. 2017) ................................................................... 20

*Arizona v. United States,*
  567 U.S. 387 (2012) ........................................................................ 2, 11

*Arpaio v. Obama,*
  797 F.3d 11 (D.C. Cir. 2015) ......................................................... 8, 9, 22

*Ayuda, Inc. v. Reno,*
  7 F.3d 246 (D.C. Cir. 1993) ................................................................. 16

*Bennett v. Spear,*
  520 U.S. 154 (1997) ........................................................................... 14

*Block v. Cmty. Nutrition Inst.,*
  467 U.S. 340 (1984) ...................................................................... 16, 17

*Cal. Cmtys. Against Toxics v. EPA,*
  934 F.3d 627 (D.C. Cir. 2019) .............................................................. 15

*Chicago v. Morales,*
  527 U.S. 41 (1999) ............................................................................ 13

*Chiles v. Thornburgh,*
  865 F.2d 1197 (11th Cir. 1989) ............................................................. 9

*Chiles v. United States,*
  69 F.3d 1094 (11th Cir. 1995) ......................................................... 11, 13

*Chiles v. United States,*
  874 F. Supp. 1334 (S.D. Fla. 1994), *aff'd*, 69 F.3d 1094 (11th Cir. 1995) .................. 13

*Conservation All. of St. Lucie Cty., Inc. v. U.S. Dep't of Transp.,*
  847 F.3d 1309 (11th Cir. 2017) ............................................................. 22

*Crane v. Johnson,*
  783 F.3d 244 (5th Cir. 2015) ............................................................... 10

*Dep't of Commerce v. New York,*
  139 S. Ct. 2551 (2019) ....................................................................... 22

*Dep't of Homeland Sec. v. New York,*
 140 S. Ct. 599 (2020), *denying modification*, 140 S. Ct. 2709 (2020)............................25

*Dep't of Homeland Sec. v. Regents of the Univ. of California,*
 140 S. Ct. 1891 (2020)........................................................................23

*FCC v. Fox Television Stations, Inc.,*
 556 U.S. 502 (2009) ..........................................................................23

*Fiallo v. Bell,*
 430 U. S. 787 (1977) ...................................................................... 16, 21

*Forsyth Cty. v. U.S. Army Corps of Eng'rs,*
 633 F.3d 1032 (11th Cir. 2011) .............................................................14

*Garcia-Mir v. Meese,*
 781 F.2d 1450 (11th Cir. 1986)..............................................................25

*Griffith v. Fed. Lab. Rels. Auth.,*
 842 F.2d 487 (D.C. Cir. 1988) ...............................................................17

*Haitian Refugee Ctr., Inc. v. Baker,*
 953 F.2d 1498 (11th Cir. 1992) ..............................................................12

*Harisiades v. Shaughnessy,*
 342 U.S. 580 (1952) ..........................................................................11

*Hawthorn Corp. v. United States,*
 98 F. Supp. 3d 1226 (M.D. Fla. 2015) .......................................................14

*Heckler v. Chaney,*
 470 U.S. 821 (1985) .....................................................................passim

*Jean v. Nelson,*
 711 F.2d 1455 (11th Cir. 1983) ..............................................................24

*Jennings v. Rodriguez,*
 138 S. Ct. 830 (2018) ..................................................................3, 16, 20

*Lincoln v. Vigil,*
 508 U.S. 182 (1993) ..........................................................................24

*Lujan v. Nat'l Wildlife Fed'n,*
 497 U.S. 871 (1990) ..........................................................................17

*Matter of Avetisyan*,
  25 I. & N. Dec. 688 (BIA 2012) ............................................................. 20

*Mendoza v. Perez*,
  754 F.3d 1002 (D.C. Cir. 2014) ............................................................ 25

*Mendoza v. Sec'y, Dep't of Homeland Sec.*,
  851 F.3d 1348 (11th Cir. 2017) ............................................................ 21

*Mississippi v. Johnson*,
  71 U.S. (4 Wall.) 475 (1867) ............................................................... 20

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ............................................................................ 23

*Nat'l Parks Conservation Ass'n v. Norton*,
  324 F.3d 1229 (11th Cir. 2003) ........................................................... 15

*Nat'l Shooting Sports Found., Inc. v. Jones*,
  716 F.3d 200 (D.C. Cir. 2013) ............................................................. 23

*Nielsen v. Preap*,
  139 S. Ct. 954 (2019) ................................................................ 3, 14, 18

*Perez v. Mortg. Bankers Ass'n*,
  575 U.S. 92 (2015) ............................................................................ 24

*Plyler v. Doe*,
  457 U.S. 202 (1982) .......................................................................... 22

*Reno v. American-Arab Anti-Discrimination Comm.*,
  525 U.S. 471 (1999) .................................................................. 3, 11, 16

*Sierra Club v. Whitman*,
  268 F.3d 898 (9th Cir. 2001) .............................................................. 12

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ............................................................................ 7

*Swain v. Junior*,
  958 F.3d 1081 (11th Cir. 2020) ............................................................. 7

*Thompson v. N. Am. Stainless, LP*,
  562 U.S. 170 (2011) .......................................................................... 17

*Town of Castle Rock v. Gonzales*,
   545 U.S. 748 (2005) ....................................................................... 13, 19

*Trump v. Hawaii*,
   138 S. Ct. 2393 (2018)................................................................... 16, 25

*United States v. Fausto*,
   484 U.S. 439 (1988) ...................................................................... 16, 17

*United States v. O'Callaghan*,
   500 F. App'x 843 (11th Cir. 2012) ......................................................22

*Whitmore v. Ark.*,
   495 U.S. 149 (1990) .............................................................................8

*Wreal, LLC v. Amazon.com, Inc.*,
   840 F.3d 1244 (11th Cir. 2016) ............................................................7

*Wyoming v. U.S. Dep't of the Interior*,
   674 F.3d 1220 (10th Cir. 2012) ..........................................................10

*Zadvydas v. Davis*,
   533 U.S. 678 (2001) ...........................................................................14

## STATUTES

5 U.S.C. § 553.................................................................................. 24, 25

5 U.S.C. § 701.................................................................................. 10, 15

5 U.S.C. § 704.........................................................................................14

6 U.S.C. § 202.................................................................................. 11, 12

8 U.S.C. § 1101........................................................................................2

8 U.S.C. § 1103......................................................................................11

8 U.S.C. § 1226..............................................................................3, 12, 16

8 U.S.C. § 1226a....................................................................................16

8 U.S.C. § 1229........................................................................................2

8 U.S.C. § 1229a......................................................................................2

8 U.S.C. § 1229c....................................................................................16

8 U.S.C. § 1231 ................................................................................................ *passim*

8 U.S.C. § 1252 ...................................................................................... 2, 16

**REGULATIONS**

8 C.F.R. § 239.1 ............................................................................................. 2

8 C.F.R. § 1003.1 ............................................................................................ 2

8 C.F.R. § 1003.6 ............................................................................................ 2

8 C.F.R. § 1240.12 .......................................................................................... 2

8 C.F.R. § 1240.15 .......................................................................................... 2

## INTRODUCTION

The Department of Homeland Security ("DHS"), like all Executive agencies, must accomplish its mission while operating with finite resources. In fulfilling its charge to enforce U.S. immigration laws, it cannot arrest, detain, and remove all noncitizens unlawfully present in the United States. Thus, during every Presidential Administration, DHS invariably has had to make decisions over where it will dedicate its limited resources in order to further its objectives of national security, border security, and public safety.

This case concerns the exercise of DHS's longstanding discretion over the enforcement of U.S. immigration laws. Soon after President Biden took office, DHS issued memoranda calling on immigration officials to focus their enforcement resources on those noncitizens who, in DHS's judgment, pose the greatest risk to the safety of the American public. Importantly, although DHS instructed its officials to prioritize enforcement actions against certain noncitizens, it did not indefinitely prohibit enforcement actions against other noncitizens, and indeed, clarified that these actions are proper if warranted by the circumstances.

Nevertheless, the State of Florida brings suit and seeks a preliminary injunction, arguing that DHS's enforcement priorities conflict with certain statutory provisions that, in its view, unconditionally require the arrest and detention of entire classes of noncitizens, regardless of circumstance. Florida's claims are belied by the text of the relevant statutory provisions, applicable case law, the nature of the challenged memoranda, and the realities of immigration enforcement.

Florida requests extraordinary relief that would have this Court dictate where DHS

1

should focus its limited resources. This Court should refuse that request for a preliminary injunction against Executive priorities in the sensitive area of immigration law.

BACKGROUND

## I.      Statutory framework.

The Immigration and Nationality Act ("INA") establishes the framework for arresting, detaining, and removing noncitizens who are unlawfully present in the United States, and a "principal feature of th[is] removal system is the broad discretion exercised by immigration officials." *Arizona v. United States*, 567 U.S. 387, 396 (2012).[1]

The removal process typically begins when DHS, in its discretion, initiates a removal proceeding against a noncitizen. *See* 8 U.S.C. § 1229(a); 8 C.F.R. § 239.1. DHS has discretion to choose which charges of removability to pursue, *see* 8 U.S.C. § 1229a(a)(2), and an immigration judge ultimately determines whether the alien is removable on those grounds, and if so, whether to enter an order of removal, *see* 8 U.S.C. § 1229a(a); 8 C.F.R. § 1240.12. An alien subject to a removal order may file an appeal before the Board of Immigration Appeals ("BIA"), 8 C.F.R. §§ 1003.1(b), 1240.15, and the removal order is stayed pending the appeal, 8 C.F.R. § 1003.6(a). If the BIA dismisses the appeal, the noncitizen may then petition for review in a federal court of appeals, and request a further stay of removal pending review. 8 U.S.C. § 1252(a)(5). Once an order of removal is final, *see id.* § 1101(a)(47)(B), and absent a stay, the noncitizen is subject to removal, see *id.* § 1231(a)(1)(A), (B)(ii). Importantly, "[a]t each stage" of this removal process, "the Executive has discretion to abandon the endeavor." *Reno v. American-Arab*

---

[1] Internal quotation marks and citations are omitted throughout this brief, unless otherwise stated.

*Anti-Discrimination Comm.*, 525 U.S. 471, 483 (1999).

This case concerns 8 U.S.C. § 1226, which sets forth the framework for "arresting and detaining" noncitizens present in the United States once removal proceedings have commenced. *Jennings v. Rodriguez*, 138 S. Ct. 830, 837 (2018). Section 1226 "distinguishes between two different categories of aliens." *Id.* Section 1226(a) applies generally to all removable noncitizens, and allows the government "to issue warrants for their arrest and detention pending removal proceedings." *Id.* at 846. This case concerns section 1226(c), which specifically covers noncitizens "who fall[] into one of [several] enumerated categories involving criminal offenses and terrorist activities." *Id.* Under section 1226(c), DHS "shall take" these noncitizens "into custody . . . when [they are] released" from criminal confinement. 8 U.S.C. § 1226(c)(1).[2] Importantly, section 1226(c) does not envision that covered individuals will always be arrested *immediately* following their release. *See Nielsen v. Preap*, 139 S. Ct. 954, 969 (2019) (section 1226(c)'s instruction that officials "shall act" upon the release of covered noncitizens is meant to "exhort [DHS] to act quickly," but does not preclude arrests "well after their release").

## II.    New guidance memoranda concerning immigration enforcement.

On January 20, 2021, the then-Acting Secretary of Homeland Security issued a memorandum titled "Review of and Interim Revision to Civil Immigration Enforcement and Removal Policies and Priorities." *See* Ex. A (hereinafter, the "DHS Memo"). The DHS Memo made note of DHS's inherent resource limitations and the "significant

---

[2] This provision also states that DHS "may release [these] alien[s]" in circumstances not relevant here. 8 U.S.C. § 1226(c)(2). Plaintiffs are not claiming that noncitizens apprehended under section 1226(c) are being released due to DHS's new guidance, and so section 1226(c)(2) is not implicated in this case.

3

operational challenges" it faces due to the COVID-19 pandemic, and, in light of these considerations, called upon DHS "components to conduct a review of policies and practices concerning immigration enforcement." *Id.* at 1. DHS components were instructed to develop recommendations concerning, among other things, "policies for prioritizing the use of enforcement personnel, detention space, and removal assets" and "policies governing the exercise of prosecutorial discretion." *Id.* at 2.

The DHS Memo also adopted two interim measures. First, since DHS is subject to "limited resources," and "cannot respond to all immigration violations," the DHS Memo identifies three broad "priority" groups of noncitizens that DHS components should focus on when rendering "a range" of "discretionary enforcement decisions, including deciding" whom to "arrest" and "detain." *Id.* These priority groups are:

1. **National security.** Individuals who have engaged in or are suspected of terrorism or espionage, or whose apprehension, arrest and/or custody is otherwise necessary to protect the national security of the United States.

2. **Border security.** Individuals apprehended at the border or ports of entry while attempting to unlawfully enter the United States on or after November 1, 2020, or who were not physically present in the United States before November 1, 2020.

3. **Public safety.** Individuals incarcerated within federal, state, and local prisons and jails released on or after the issuance of this memorandum who have been convicted of an "aggravated felony," as that term is defined in section 101(a)(43) of the [INA] at the time of conviction, and are determined to pose a threat to public safety.

*Id.* The DHS Memo clarifies, however, that "nothing" therein "prohibits the apprehension or detention of" other noncitizens "who are *not* identified as priorities." *Id.* at 3 (emphasis added). It also calls on "the Acting Director" of U.S. Immigration and Customs Enforcement ("ICE") to "issue operational guidance on the implementation" of this priority framework. *Id.*

4

The DHS Memo also instituted a second interim measure for one-hundred days: a "pause on removals of any noncitizen with a final order of removal," subject to a few exceptions. *Id.* The DHS Memo explained that this removal pause would allow DHS to first review its policies and adopt modifications that may "ensure that [its limited] resources are directed to [DHS's] highest enforcement priorities." *Id.*

On February 18, 2021, ICE issued a memorandum to operationalize the removal priorities in the DHS Memo. *See* Ex. B (the "ICE Memo," and together with the DHS Memo, the "Memoranda"). The ICE Memo confirms that "ICE operates in an environment of limited resources," and "necessarily must prioritize" certain "enforcement and removal actions over others" in order to "most effectively achieve [its] mission" of "national security, border security, and public safety." *Id.* at 2-3. The memo then catalogues the three priority groups identified in the DHS Memo, and notes that, at ICE's request, DHS agreed to include "qualifying members of criminal gangs and transnational criminal organizations" into the list of priority groups. *Id.* at 1, 4-5 (hereinafter, the priority group provisions in the Memoranda will be referred to as the "Priority Framework").

Furthermore, the ICE Memo reiterates that the Priority Framework does not "prohibit the arrest, detention, or removal of *any* noncitizen," and that enforcement actions against non-priority persons may still be permissible and justified based on "all relevant facts and circumstances," including the nature of any prior criminal convictions. *Id.* at 3 (emphasis added). The memo requires that ICE officials secure "preapproval" of "enforcement or removal actions" of non-priority persons to ensure that resources are spent pursuing priority cases. *Id.* at 6. However, it acknowledges that, "[i]n some cases,

exigent circumstances and the demands of public safety will make it impracticable to obtain preapproval." *Id.* Thus, in these circumstances, the ICE Memo allows agents to "conduct the enforcement action and then request approval . . . within 24 hours." *Id.* The memo also includes a general catch-all provision allowing agents to submit "requests to exercise . . . individualized discretion" in certain cases, if it is "in the interest[] of law and justice." *Id.* Finally, the memo clarifies that its provisions "will remain in effect" only until "new enforcement guidelines" are instituted, which it anticipated would occur around mid-May 2021. *Id.* at 1.

## III.  Litigation history.

Shortly after the DHS Memo was issued, the State of Texas brought suit in the Southern District of Texas, asserting a number of claims against one aspect of the DHS Memo: the 100-day removal pause. *See Texas v. U.S.*, 21-cv-3, ECF No. 1 (S.D. Tex. Jan. 22, 2021). Texas sought both a temporary restraining order and a preliminary injunction against the removal pause, which the court granted on January 26, 2021 and February 23, 2021, respectively. *See Texas v. U.S.*, 21-cv-3, ECF Nos. 16, 85 (S.D. Tex. Jan. 22, 2021).

On March 8, 2021, Florida brought suit in this Court, primarily challenging the Priority Framework.[3] *See* ECF No. 1. Plaintiff now moves for a preliminary injunction based on three Administrative Procedure Act ("APA") claims: *(i)* the Priority Framework allegedly conflicts with section 1226(c) since the former does not include all categories of noncitizens that the latter states DHS "shall" apprehend; *(ii)* the Priority Framework is

---

[3] Florida also nominally challenges the now-enjoined removal pause in the DHS Memo, relying almost exclusively on a citation to the *Texas* preliminary injunction opinion. *See* PI Mot. at 21.

6

allegedly arbitrary and capricious; and *(iii)* the Memoranda are procedurally defective since they were not issued following a notice-and-comment process.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary and drastic remedy, and [the plaintiff] bears the burden of persuasion to clearly establish all . . . of the[] prerequisites," including: a substantial likelihood of success on the merits, irreparable harm, and that the balance of equities and the public interest favor preliminary relief. *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016). "[W]here the government is the party opposing the preliminary injunction, its interest and harm merge with the public interest." *Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020).

## ARGUMENT

**I.    Florida fails to establish a non-speculative injury, and thus it both lacks standing and cannot show irreparable harm.**

Florida fails to establish standing, much less irreparable harm. Florida's injury theories all stem from its allegation that the Memoranda will result in a net reduction of enforcement actions against noncitizens with criminal records in Florida, resulting in more crime in Florida. *See* PI Mot. at 9. Florida's showing falls well short of establishing this speculative chain of alleged eventualities.

To establish standing to "seek injunctive relief, a plaintiff must show that" it "is under threat of suffering" an "actual and imminent" injury caused by "the challenged action," and that "a favorable judicial decision will prevent" that injury. *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). The "threatened injury must be *certainly impending*

7

to constitute injury in fact"; allegations of "possible future injury do not satisfy . . . Art. III." *Whitmore v. Ark.*, 495 U.S. 149, 158 (1990) (emphasis added).

Florida's theory of increased crime resulting from the non-detention of certain noncitizens is speculative, and does not demonstrate that any injury is "*certainly* impending." For one, the Memoranda do not require a net reduction in enforcement actions. They simply require DHS components to now prioritize those noncitizens who, in DHS's view, pose the greatest risk to public safety (*e.g.*, those who have committed aggravated felonies, and those involved in terrorist and gang-related activities, *see* ICE Memo at 4-5). Thus, the Memoranda could potentially result in no change in the number of enforcement actions against noncitizens with criminal records in Florida, or result in more vigorous enforcement against the most dangerous criminals. And even assuming the Memoranda were eventually to result in a drop in enforcement actions, that does not mean the noncitizens temporarily spared from the enforcement actions would necessarily commit crimes, or commit more crimes than those whom DHS may now promptly arrest due to the Priority Framework.

Thus, this case is similar to *Arpaio v. Obama*, 797 F.3d 11 (D.C. Cir. 2015), where the court found that the plaintiff lacked standing to challenge certain immigration policies under which "relevant agencies temporarily . . . defer[red] low-priority removals" in order to "focus their resources on removing dangerous criminals." *Id.* at 14. The plaintiff argued—similar to Florida here—that the "challenged policies" would cause "more individuals [to] remain unlawfully in [his county] and commit crimes." *Id.* The court rejected this argument, noting that the plaintiff's "theory rest[ed] on the mistaken premise

that the challenged policies decrease the number of removals below what would have been accomplished had the policies not been adopted," and that the policies "prioritize[d] [the] removal of individuals who pose a threat to public safety." *Id.* at 15. The court also reasoned that even if the challenged policies resulted in a net decrease in removals, the plaintiff's theory "depend[ed] on unsupported speculation that these policies . . . will" necessarily "increase the number of crimes in [plaintiff's county] above what could reasonably be anticipated in the absence of any such policies." *Id.* Each of these conclusions applies equally here.

Florida relies on discrete anecdotes of particular noncitizens evading immediate arrest and detention, allegedly due to the Memoranda. For example, Plaintiff asserts that DHS recently chose not to apprehend seven noncitizens upon their release from state custody due to the DHS Memo. *See* PI Mot. at 9. But five of these noncitizens would not be subject to section 1226(c), and so even under Florida's legal theory, they were not unconditionally subject to mandatory detention before the Memoranda were issued. *See* Declaration of Mitchell Diaz, Assistant Field Office Director for the Miami Field Office, ¶¶ 8-12 (Mar. 23, 2021). Regardless, the non-apprehension of seven individuals does not translate to, and Florida does not demonstrate, a *net* decrease in the arrests and detention of noncitizens with criminal records. Although these seven individuals may be spared immediate detention, the Memoranda may still result in prompt action against a larger number of noncitizens with more severe criminal histories. The same reasoning applies to the other anecdotes Florida relies upon. *See* PI Mot. at 9–10.

In any event, this allegation of increased crime does not establish *Florida's* standing.

To start, crime results in an injury against individual people, not the State. And States cannot bring suit on behalf of their citizens—*e.g.*, a *parens patriae* action—against the federal government. *Chiles v. Thornburgh,* 865 F.2d 1197, 1209 (11th Cir. 1989) ("a state does not have standing as *parens patriae* to bring an action against the federal government to vindicate the rights of its citizens"). Furthermore, Florida cannot establish an injury by speculating about economic burdens that potential crimes may impose on the State. Florida would have to show not only that the Memoranda would "certainly" result in more crime in Florida, but also that these crimes will necessarily be of a nature that imposes some further injury on Florida specifically. *Cf. Crane v. Johnson*, 783 F.3d 244, 252 (5th Cir. 2015) (finding Texas's claim of economic injury speculative); *Wyoming v. U.S. Dep't of the Interior,* 674 F.3d 1220, 1231 (10th Cir. 2012) (rejecting Wyoming's purported economic injury as speculative). Florida fails to do so.

In any event, Florida's requested relief may not redress its alleged injury. Florida seeks only an order enjoining the Priority Framework, without specifying what will replace it. *See* PI Mot. at 24. Again, every Administration must institute *some* prioritization scheme for immigration enforcement. *See* PI Mot. at 5. Thus, in response to an injunction against the Priority Framework, Defendants would have to construct a *different* prioritization scheme, and it is unclear whether that scheme would satisfy Florida. Accordingly, Florida has failed to establish both standing and irreparable harm.

## II. APA.

### a. Florida cannot clear four threshold obstacles to its APA claims.

### i. The challenged actions are committed to agency discretion.

The Memoranda reflect agency actions which are committed to agency discretion by law, and are therefore not subject to judicial review under the APA. *See* 5 U.S.C. § 701(a)(2). The Executive's "[r]efusals to take enforcement steps" are presumptively not subject to judicial review. *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). Whether to enforce a law in a particular instance or set of instances (or to prioritize against certain criminal noncitizens over others) "involves a complicated balancing of a number of factors which are peculiarly within [the Executive's] expertise," including "whether agency resources are best spent on this violation or another" and "whether the particular enforcement action requested best fits the agency's overall policies." *Id.* at 831.

Discretion to prioritize among cases in immigration enforcement is especially important. "[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations [and] the war power." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952). The Executive must consider a host of issues, such as the "dynamic nature of relations with other countries" and the need for enforcement policies to be "consistent with this Nation's foreign policy with respect to these and other realities." *Arizona*, 567 U.S. at 397.

Congress accordingly, and expressly, empowered the Secretary to establish "national immigration enforcement policies and priorities," 6 U.S.C. § 202(5), and to "issue such instructions; and perform such other acts *as he deems necessary* for carrying out his authority" under the statute, 8 U.S.C. § 1103(a)(3) (emphasis added); *see id.* § 1103(a)(1). The Supreme Court and Eleventh Circuit have therefore repeatedly

11

recognized the Executive's broad discretion in this context. *See Reno*, 525 U.S. at 483; *Arizona*, 567 U.S. at 396; *Chiles v. United States*, 69 F.3d 1094, 1096 (11th Cir. 1995); *Haitian Refugee Ctr., Inc. v. Baker*, 953 F.2d 1498, 1507 (11th Cir. 1992).

Plaintiff contends that this broad discretion is eliminated by the language of two statutory provisions, each of which states that DHS "shall" engage in certain enforcement actions against noncitizens. *See* PI Mot. at 13–14 (citing 8 U.S.C. § 1226(c); *id.* at 15 (citing 8 U.S.C. § 1231(a)(1)(A)). But Florida misunderstands both the nature of the Memoranda and those statutory provisions. First, both Memoranda establish agency *priorities* for carrying out immigration laws. They do not prohibit the arrest or detention of any noncitizen. The DHS Memo directs DHS components to focus their enforcement resources on what DHS has determined to be the most pressing cases, principally national security and public safety threats. *See* Ex. A, at 2–3; *id.* at 3–4. The ICE Memo establishes similar priorities. *See* Ex. B., at 4–5. Setting enforcement priorities is both inherently necessary to effective operations and well within the express grant of statutory authority. *See* 6 U.S.C. § 202(5). The challenged agency actions merely de-prioritize certain actions against some noncitizens—for now—and establish an internal agency procedure for verifying that agency resources are being appropriately employed.

Second, Plaintiff misapprehends the import of the word "shall" in the relevant statutory provisions. Courts routinely find non-enforcement decisions exempt from substantive judicial review, even in the face of seemingly mandatory language. *See, e.g.*, *Chaney*, 470 U.S. at 835 (non-enforcement unreviewable under statute directing that violators "shall be imprisoned"); *Sierra Club v. Whitman*, 268 F.3d 898, 903–05 (9th Cir.

12

2001) (non-enforcement unreviewable under "shall" statute in Clean Water Act). Here, each provision provides that the Secretary "shall" take certain action with regard to certain noncitizens, but neither directs how he is to determine which of the many cases to pursue. *Cf. Chaney*, 470 U.S. at 833.

The Supreme Court has thus admonished that a statute directing enforcement—even one using the word "shall"—generally does not displace the Executive's inherent authority to exercise enforcement discretion. Congress displaces the presumption of unreviewability only if it "limit[s] an agency's exercise of enforcement power . . . either by setting substantive priorities, or by otherwise circumscribing an agency's power to discriminate among issues or cases it will pursue." *Chaney*, 470 U.S. at 833. A provision that merely directs that the enforcement authority "shall" enforce a law offers no such limitations. *See Town of Castle Rock v. Gonzales*, 545 U.S. 748, 761 (2005) (the "deep-rooted nature of law-enforcement discretion" persists "even in the presence of seemingly mandatory commands"). Thus, the Supreme Court has noted that "a true mandate of police action . . . require[s] some stronger indication" of legislative intent than the bare "shall." *Id.*; *see also Chicago v. Morales*, 527 U.S. 41, 62 n.32 (1999) (similar); *Chiles v. United States*, 874 F. Supp. 1334, 1340 (S.D. Fla. 1994), *aff'd*, 69 F.3d 1094 (11th Cir. 1995) ("shall" did not impose mandatory duty in immigration context, just as direction that U.S. Attorney "shall . . . prosecute for all offenses against the United States" did not impose mandatory duty to prosecute "all" cases).

Here, DHS has exercised its inherent and statutory authority to prioritize its limited resources to pursue the immigration cases that, in its judgment, are most pressing. "An

13

agency generally cannot act against each technical violation" of a statute, and the "agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Chaney*, 470 U.S. at 831–32; *cf. Hawthorn Corp. v. United States*, 98 F. Supp. 3d 1226, 1242 (M.D. Fla. 2015) ("An agency has broad discretion to choose how best to marshal its limited resources and personnel to carry out its delegated responsibilities."). The Supreme Court has already recognized that the INA's provisions must be read in a practical manner that accounts for resource limitations and other factors. In *Zadvydas v. Davis*, for example, the Supreme Court observed that it is doubtful "that when Congress shortened the removal period to 90 days," it believed that "all reasonably foreseeable removals could be accomplished in that time." 533 U.S. 678, 701 (2001). And in *Preap* the Court noted that the provision stating that DHS "shall" apprehend covered aliens "when . . . released" did not actually contemplate immediate arrests of all covered noncitizens. 139 S. Ct. at 969; *see also id.* at 973 (Kavanaugh, J., concurring).

Decisions over how to prioritize limited resources involve a complicated balancing of factors uniquely within the agency's expertise; they are committed to the agency's discretion and are not reviewable under the APA. *See Chaney*, 470 U.S. at 832; *Forsyth Cty. v. U.S. Army Corps of Eng'rs*, 633 F.3d 1032, 1040-41 (11th Cir. 2011).

> ii.    *The challenged actions are not "final agency action" under the APA.*

The APA allows challenges only to "final agency action." 5 U.S.C. § 704. Agency action is "final" under the APA only if it is "the consummation of the agency's decisionmaking process" and determines "rights or obligations." *Bennett v. Spear*, 520 U.S. 154, 178 (1997). Here, the Memoranda are not "final agency action" under the APA. The

14

Memoranda—which provide interim guidance—do not change any person's legal status, determine any legal benefits, or reverse any previous agency action. Quite the opposite: noncitizens subject to a final order of removal have no greater right to remain in the United States under the Memoranda than they did before the Memoranda were issued. And those described in § 1226(c) remain subject to arrest immediately upon their release, just as they were before the Memoranda. Indeed, the Memoranda confirm that they do not "create any right or benefit." Ex. A at 4; Ex. B, at 8. Rather, they set out enforcement priorities going forward.

Furthermore, agency action is not rendered "final" for purposes of the APA simply because it may have incidental effects; it is "final" only if it gives "rise to *direct* and appreciable legal consequences." *Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 635 (D.C. Cir. 2019) (emphasis added). Thus, as the Eleventh Circuit has recognized, "the Supreme Court has defined a nonfinal agency order as one that does not itself adversely affect complainant but only affects his rights adversely on the contingency of future administrative action." *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1237 (11th Cir. 2003). That describes the scenario here: DHS's internal priorities for immigration enforcement have no immediate effect on any individual or state; any consequences are "contingen[t] of future administrative action."

### iii.   *Congress has precluded judicial review of these types of decisions.*

The APA does not provide a cause of action when another "statute[] preclude[s] judicial review." 5 U.S.C. § 701(a)(1). "Whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from

the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984). A detailed review scheme that allows some parties, but not others, to challenge the executive action at issue is "strong evidence that Congress intended to preclude [other parties] from obtaining judicial review." *United States v. Fausto*, 484 U.S. 439, 448 (1988).

Judicial review of immigration enforcement decisions is subject to a carefully reticulated scheme. "For more than a century, this [Supreme] Court has recognized that the admission and exclusion of foreign nationals is a 'fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'" *Trump v. Hawaii*, 138 S. Ct. 2393, 2418 (2018) (quoting *Fiallo v. Bell*, 430 U. S. 787, 792 (1977)). Thus, Congress enacted several provisions "aimed at protecting the Executive's discretion from the courts." *Reno*, 525 U.S. at 486–87. *See* 8 U.S.C. §§ 1226(e); 1226a(b)(1); 1229c(f); 1231(h); 1252(a)(2)(A), (a)(2)(B), (a)(2)(C), (b)(4)(D), (b)(9), (d), (f), (g). Here, Plaintiff challenges a DHS decision to defer certain enforcement actions attendant to removal proceedings. But section 1229a already sets forth a detailed, and narrow, path for judicial review of removal decisions, including challenges to "decision[s] to detain [aliens]." *Jennings*, 138 S. Ct. at 841; *see also supra* at 2.

Florida makes no effort to invoke this statutory review mechanism, and for good reason: it does not offer a means for a *State* to challenge any decision related to removal. *Cf. Ayuda, Inc. v. Reno*, 7 F.3d 246, 250 (D.C. Cir. 1993) (organizational plaintiff could not challenge INS policies "that bear on an alien's" removal). Congress's decision to allow noncitizens, but not sovereign entities, to invoke these review mechanisms is "strong

16

evidence that Congress intended to preclude" sovereign entities "from obtaining judicial review" of removal and detention decisions. *Fausto*, 484 U.S. at 448. Thus, in *Block*, Congress provided a specific review scheme for "dairy handlers" but not for "consumers." 467 U.S. at 346–47. But consumers were not free to then challenge the agency action under the APA; they could not challenge the agency action at all. *Id.* at 347. Just so here.

        *iv.*     *Florida cannot challenge the DHS Memo's removal pause because it does not fall within the relevant zone of interests.*

"[A] plaintiff may not sue [under the APA] unless [it] falls within the zone of interests sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 177 (2011). Plaintiff claims that the removal pause conflicts with 8 U.S.C. § 1231, but that provision makes clear that "[n]othing [therein] shall be construed to create any substantive or procedural right or benefit that is legally enforceable by *any party* against the United States or its agencies or officers or any other person." 8 U.S.C. § 1231(h) (emphasis added). Thus, Congress made clear that it wanted no party to judicially enforce section 1231. Accordingly, Florida's challenges to the Memoranda may not be brought under the APA.[4]

**b. Florida's APA claims fail on the merits.**

        *i.*     *The Priority Framework is not contrary to law.*

Florida argues that section 1226(c) unconditionally requires DHS to arrest and

---

[4] To get around the APA reviewability problem, Florida tries to invoke an exception derived from the Supreme Court's decision in *Leedom v. Kyne*, where "[e]ven [when] Congress is understood generally to have precluded review," there is a "narrow exception" where an agency has committed an "extreme" error, "disregard[ing] a specific and unambiguous statutory directive." *Griffith v. Fed. Lab. Rels. Auth.*, 842 F.2d 487, 492 (D.C. Cir. 1988). As stated herein, however, the statutes at issue here are not unambiguous in light of relevant precedent concerning law enforcement provisions.

detain all covered noncitizens, and thus, because certain noncitizens covered by section 1226(c) are not listed as priorities in the Memoranda, the Memoranda must conflict with section 1226(c). Florida's theory fails for at least two reasons.

First, even assuming section 1226(c) may be read to impose an unconditional command, the Memoranda do not prohibit the arrest or detention of any noncitizen. They merely prioritize—for now—enforcement actions against certain noncitizens based on public safety and national security considerations. Other noncitizens, however, may still be arrested and detained while the Priority Framework remains in place, if warranted. *See supra* at 4-6; Declaration of Peter B. Berg, Acting Deputy Executive Associate Director of ICE Enforcement and Removal Operations ¶ 9 (Mar. 23, 2021). At best, Florida may argue that the Memoranda will lead to a delay in the arrest and detention of certain noncitizens who are covered by section 1226(c) but are not identified as priorities in the Memoranda. But the Supreme Court in *Preap* recognized that, in section 1226(c), Congress did not expect DHS to immediately arrest all noncitizens covered by that provision. *See* 139 S. Ct. at 969; *supra* at 3. Indeed, in the principal case Florida relies upon—*Preap*—some plaintiffs were arrested "several years" after they were released from criminal confinement. *Id.* at 961.

Florida protests that the Memoranda, in effect, "cease" the arrest and detention of certain noncitizens. *See* PI Mot. at 6, 20-21. For example, it argues that, during the interim period in which the Memoranda are in effect, officials will need to request preapproval to arrest certain noncitizens, and these requests may be denied. *See id.*, at 21. But requiring some supervisory accountability does not amount to a *prohibition* on the arrest of any

noncitizen, any more than a warrant requirement amounts to a prohibition on the search of a home. Officials may secure preapproval, if warranted. And even if they cannot, this does not categorically prevent them from arresting and detaining the relevant noncitizen in the future.[5] The Memoranda simply create a new prioritization scheme; they do not insulate noncitizens from enforcement actions. Accordingly, the Memoranda are consistent with section 1226(c).

Regardless, and as explained above, section 1226(c) does not impose an unconditional command to arrest and detain all covered noncitizens. *See supra* at 11-14. A statute directing specific enforcement actions, even one using the word "shall," still preserves the Executive's inherent authority to exercise enforcement discretion. *See id*. Indeed, resource limitations will ensure that DHS can *never* arrest all noncitizens covered by section 1226(c), and Florida does not assert that DHS was accomplishing this insurmountable task before the Memoranda were issued. DHS will inevitably have to prioritize certain noncitizens over others, *see Chaney*, 470 U.S. at 831, and the Memoranda merely provide guidance on which noncitizens to prioritize.

Further, section 1226(c), in particular, lacks the "stronger indication" of Congressional intent necessary to impose an unconditional mandate in this context. *Castle Rock*, 545 U.S. at 761. To the contrary, multiple indicators suggest that Congress did *not*

---

[5] Florida argues that "the record reflects that the agencies are treating the memos as a prohibition," and cites to a declaration that appends e-mails from certain ICE officials. *See* PI. Mot., Ex. 1. But these e-mails state only that ICE is *currently* choosing not to pursue immigration enforcement actions against certain *individuals*, not that they are generally prohibited from doing so or that they will not pursue those actions later. *See*, *e.g.*, *id.*, at 10 ("Subject currently does not meet our removal criteria"). Additionally, as noted in the Berg Declaration, DHS personnel *are* pursuing enforcement actions against non-priority noncitizens. Berg. Decl. ¶ 9.

intend section 1226(c) to impose an unconditional command to apprehend all covered noncitizens. For example, "Congress has not appropriated sufficient funds to remove all . . . undocumented aliens." *Arizona Dream Act Coal. v. Brewer*, 855 F.3d 957, 976 (9th Cir. 2017). Further, section 1226(c)'s directive is only triggered when there is a "pending removal proceeding[]," *Jennings*, 138 S. Ct. at 846, and DHS is "invested with the sole discretion to commence [such] removal proceedings." *Matter of Avetisyan*, 25 I. & N. Dec. 688, 690–91 (BIA 2012). Thus, if section 1226(c)'s directive is contingent on an underlying event within DHS's discretion—initiating removal proceedings—it is unlikely Congress intended this directive to truly be an unconditional mandate.

Finally, Florida briefly challenges the removal pause in the DHS Memo, citing only to *Texas*, and arguing that this pause conflicts with 8 U.S.C. § 1231(a)(1)(A). *See* PI Mot. at 15. However, their argument concerning this provision is similar to their argument concerning section 1226(c): section 1231(a)(1)(A) states that DHS "*shall* remove [an] alien from the United States within a period of 90 days" when the "alien is ordered removed," and thus it imposes an unconditional mandate that conflicts with the removal pause. But as set forth herein, and in DHS's response memorandum in *Texas*, this language does not remove the inherent discretion DHS has over immigration enforcement decisions.[6] *See supra* at 11-14; *Texas v. U.S.*, 21-cv-3, ECF No. 83 (S.D. Tex. Feb. 12, 2021).

---

[6] Plaintiffs briefly reference their Constitutional claims, but none is sufficiently developed to justify emergency relief. *See* PI Mot. at 24. In any event, these claims—*e.g.*, the "Take Care Clause" claim—are based on the same premise as Plaintiffs' principal statutory claim: that the Memoranda allegedly conflict with certain statutory provisions. Thus, Defendants' arguments herein apply equally to the Constitutional claims. Finally, there is no independent cause of action for claims alleging that the Executive has not "faithfully executed" the laws. *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 499 (1867).

ii.     *The Priority Framework is not arbitrary and capricious.*

The Memoranda provide a rational scheme for prioritizing limited resources, and thus survive the highly deferential arbitrary and capricious review. "To determine whether the agency's action was arbitrary and capricious," the Court "examine[s] whether the agency came to a rational conclusion and do[es] not substitute [its] own judgment for that of the agency." *Mendoza v. Sec'y, Dep't of Homeland Sec.*, 851 F.3d 1348, 1353 (11th Cir. 2017). "This standard is *exceedingly deferential*." *Id.* at 1352–53 (emphasis added). Courts are especially deferential in the context of immigration policy. *See* s*upra* at 16 (describing effect of *Hawaii* on judicial review of immigration policy).

Here, the Memoranda call on immigration officials to focus their limited resources on noncitizens that pose the greatest risk to national security and public safety, while still providing flexibility for those officials to take enforcement actions other noncitizens with criminal records based on individual circumstances. *See* Ex. A, at 2–3; Ex. B, at 3–4. That is what law enforcement officers do day-to-day anyhow—prioritize the most serious offenses. Additionally, the Memoranda also seek to institute temporary practices that limit close contact among those involved in the immigration enforcement process in light of the COVID-19 pandemic. *See* Ex. B, at 2. These justifications are sufficient to survive arbitrary and capricious review. *See*, *e.g.*, *Chaney*, 470 U.S. at 842 (Marshall, J. concurring) ("a decision not to enforce that is based on valid resource-allocation decisions will generally not be arbitrary, [and] capricious").

To show otherwise, Florida cycles through a number of underdeveloped theories. First, Florida protests that Defendants have failed to cite sufficient evidence for their

resource limitation concerns. *See* PI Mot. at 22. But DHS need not make a detailed evidentiary showing; it must provide only a "rationale" that is "clearly explained." *Conservation All. of St. Lucie Cty., Inc. v. U.S. Dep't of Transp.*, 847 F.3d 1309, 1326 (11th Cir. 2017). Regardless, an evidentiary showing is uniquely unnecessary here. Resource limitation concerns are self-evident, and the government—across several administrations—has repeatedly referred to these limitations when justifying its policies. *See*, *e.g.*, *Plyler v. Doe*, 457 U.S. 202, 218 n.17 (1982); *Arpaio*, 797 F.3d at 16 (noting DHS's resource limitations).

Florida then argues that Defendants' stated justifications are "pretextual," and that the Memoranda were motivated by policy considerations. *See* PI Mot. at 22–23. To establish a "pretext" claim, however, Florida must show that the stated justifications played *no* role in motivating the agency action at issue; not just that other factors (including policy preferences) played a role as well. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019) (finding a pretext claim viable when "the sole stated reason" for an agency action "seems to have been contrived"). The Supreme Court made clear that "a court may not reject an agency's stated reasons for acting simply because the agency might also have had other unstated reasons," such as "an Administration's priorities." *Id.* at 2573. Florida does not show that resources constraints, and COVID-related concerns, had no influence on the Memoranda's design.[7] Thus, it is immaterial that other

---

[7] Florida asserts that President Biden's press secretary "admitted" that the "Administration does not want to enforce the immigration laws." PI Mot., at 22-23. But the cited sources do not support this claim. For example, Florida cites to a declaration from a former ICE official stating, with no direct evidence, that he "believe[s]" the stated reasons are "pretext[ual]." Ex. 18 at 13. This evidence cannot overcome the "presumption of regularity," where in "the absence of *clear evidence to the contrary*, courts presume that

considerations—including humanitarian concerns— may have played a role as well.

Florida also argues that Defendants ignored the costs imposed on the State by the Memoranda; specifically, the purported risk of increased crime. *See* PI Mot. at 23. But as explained above, the Memoranda seek to increase security (and thus lower social costs) by concentrating limited resources on those most likely to pose a threat to national security and public safety. *See supra* at 4-5, 8.

Finally, Florida argues that Defendants failed to acknowledge that the Memoranda constitute a change in policy, and failed to consider alternatives. The Supreme Court has stated that an agency must "display awareness that it *is* changing position." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). The Memoranda do just that: the ICE Memo implements the DHS Memo, which was itself titled "Review of and Interim *Revision* to" enforcement priorities. Additionally, an agency need not "consider all policy alternatives in reaching decision." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 51 (1983). "[W]hen an agency" changes its policy, it need only "consider the alternative[s] that are within the ambit of the existing [policy]." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1913 (2020); *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013) ("an agency must consider . . . reasonably obvious alternative[s]" that are "significant and viable"). Here, Florida fails to identify a single policy alternative that is "within the ambit of existing policy" or otherwise "obvious," "significant and viable" that Defendants failed to consider. That

---

[government officials] have properly discharged their official duties." *United States v. O'Callaghan*, 500 F. App'x 843, 848 (11th Cir. 2012).

alone dooms their claim.[8] Accordingly, the Memoranda are not arbitrary and capricious.

**III.    Florida's notice-and-comment challenge fails.**

The Memoranda are exempt from the APA's notice and comment requirement. First, this requirement does not apply to "general statements of policy," 5 U.S.C. § 553(b)(3)(A), which "advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power," *Lincoln v. Vigil*, 508 U.S. 182, 197 (1993). By contrast, rules adopted through notice-and-comment have the force and effect of law, and create legally enforceable rights or obligations. *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). Here, the Memoranda are quintessential policy statements: they announce how and when DHS components will pursue (or forbear from) enforcement, *see supra* at 4-5—a decision "generally committed to an agency's absolute discretion." *Chaney*, 470 U.S. at 831. But they do not alter the rights or obligations of any person.

Florida relies on *Jean v. Nelson*, 711 F.2d 1455 (11th Cir. 1983), which is inapplicable. There, the court found that the "general statement of policy" exception did not apply due to the "peculiar facts" of the case, including that the detention policy was "not . . . developed . . . at the highest level of government" and it was understood that officials were not "free to exercise discretion." *Id.* at 1481-82. Here, the Memoranda were developed at the "highest level[s] of government," and they explicitly leave agents with discretion. *See supra* at 3-6.

Further, even if the Court concludes that the Memoranda are not general

---

[8] Florida also briefly notes that Defendants failed to consider Plaintiff's "reliance interests," namely that it passed legislation to improve coordination with immigration officials. PI Mot., at 23. But Plaintiff fails to explain how the Memoranda prohibit Florida from continuing to coordinate with these officials.

statements of policy, the APA also exempts procedural rules from notice-and-comment, *see* 5 U.S.C. § 553(b)(A), in order to "ensure that agencies retain latitude in organizing their internal operations," *Mendoza v. Perez*, 754 F.3d 1002, 1023 (D.C. Cir. 2014). Here, the Memoranda are procedural rules because they inform internal resource allocation. The Memoranda are thus exempt from the APA's notice-and-comment requirement.

## IV. The balance of equities and public interest disfavor a preliminary injunction.

Florida's requested relief would interfere with the federal government's judgment concerning where it should dedicate its resources, undermining its "weighty interest in the efficient administration of the immigration laws." *Garcia-Mir v. Meese*, 781 F.2d 1450, 1454 (11th Cir. 1986); *see also* Berg Decl. ¶¶ 11-19. Further, as explained above, the Memoranda further the public interest by dedicating resources towards those likely to pose the greatest risk to national security, border security, and public safety. *See supra* at 4-5, 8.

To the extent the Court issues any relief, it should be limited to Florida. Nationwide relief that would affect those who are not parties to this case would exceed this Court's authority under Article III and violate longstanding equitable doctrines. *See Dep't of Homeland Sec. v. New York,* 140 S. Ct. 599 (2020) (Gorsuch, J., concurring); *Trump v. Hawaii*, 138 S. Ct. at 2429 (Thomas, J., concurring). Further, nationwide relief is unnecessary to address Florida's alleged harms, all of which are limited to its territory.

**CONCLUSION**

For these reasons, the Court should deny Florida's Motion for a Preliminary Injunction.

25

Dated: March 23, 2021

Respectfully submitted,

BRIAN M. BOYNTON
Assistant Attorney General

EREZ REUVENI
Assistant Director
U.S. Dept. of Justice, Civil Division
Office of Immigration Litigation –
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044

BRIGHAM J. BOWEN
Assistant Branch Director

*/s/* Kuntal Cholera
KUNTAL V. CHOLERA
ADAM D. KIRSCHNER
BRIAN C. ROSEN-SHAUD
MICHAEL F. KNAPP
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs
Branch 1100 L, NW Washington, DC
20005
Tel.: (202) 305-8645
Fax: (202) 616-8470
Email: kuntal.cholera@usdoj.gov

26