## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

STATE OF FLORIDA,

      Plaintiff,

v.                              Case No: 8:21-cv-541-CEH-SPF

UNITED STATES OF AMERICA,
*et al*.,

      Defendants.

_____/

## O R D E R

This matter comes before the Court on Florida's Motion for a Preliminary Injunction (Doc. 4), filed on March 9, 2021. Plaintiff, the State of Florida, requests the Court enter a preliminary injunction precluding the federal government from implementing and enforcing interim immigration policies set forth in the Department of Homeland Security's January 20, 2021 Memo and the U.S. Immigration and Customs Enforcement's February 18, 2021 Memo. Defendants filed a response in opposition. Doc. 23. The State of Florida filed supplemental exhibits to which the Defendants responded with a declaration. Docs. 29, 30. The Court held a hearing on the motion on April 13, 2021. Also pending is Florida's unopposed motion to supplement its motion for preliminary injunction (Doc. 34), to which Defendants responded (Doc. 36). Florida seeks to supplement its motion for preliminary injunction with additional information and an exhibit, which the Court will grant. The Court, having considered the motion, the response, the parties' supplemental filings, heard

argument of counsel, and being fully advised in the premises will deny Florida's Motion for a Preliminary Injunction.

## I.      BACKGROUND

The State of Florida ("Florida") sues Defendants, the United States of America (the "Government"), Alejandro Mayorkas in his official capacity as Secretary of the United States Department of Homeland Security ("Mayorkas"), United States Department of Homeland Security ("DHS"), Troy Miller in his official capacity as Acting Commissioner of U.S. Customs and Border Protection ("Miller"), U.S. Customs and Border Protection ("CBP"), Tae Johnson in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement ("Johnson"), U.S. Immigration and Customs Enforcement ("ICE"), Tracy Renaud in her official capacity as Acting Director of U.S. Citizenship and Immigration Services ("Renaud"), and U.S. Citizenship and Immigration Services ("USCIS") (collectively "Defendants"), in a seven-count Complaint for declaratory and injunctive relief. Doc. 1. In its Complaint, Florida seeks to enjoin the federal government from implementing interim immigration enforcement policies as set forth in a DHS memorandum dated January 20, 2021 (the "January 20 memo") and an ICE memorandum issued February 18, 2021 (the "February 18 memo"). *Id.* According to Florida, these memos effectively abandon the federal government's duty to enforce immigration laws by failing to detain and remove criminal aliens and by imposing a 100-day pause on the removal of noncitizens, regardless of their criminal status.

## A.  Immigration Law Framework

The Immigration and Nationality Act ("INA") provides a comprehensive framework for enforcement of the immigration laws. The Secretary of DHS is "charged with the administration and enforcement" of the immigration laws. 8 U.S.C. § 1103 (a)(1). Congress specifies which noncitizens may be removed from the United States and the procedures for doing so. *Arizona v. United States*, 567 U.S. 387, 396 (2012). Specifically, immigration laws provide that noncitizens are subject to removal if they were "inadmissible at the time of entry," or they commit certain offenses or meet other criteria for removal. *Id.* "A principal feature of the removal system is the broad discretion exercised by immigration officials." *Id.*

At issue here, Florida cites to 8 U.S.C. § 1226(c),[1] which commands federal immigration authorities to arrest all criminal noncitizens, and 8 U.S.C. § 1231 (a)(1)(A), which requires federal officials to remove a noncitizen from the United States within 90 days after issuance of a final order of removal. In support of its request for injunctive relief, Florida points to two recent memoranda wherein the Biden Administration purportedly "seeks to post hoc veto much of the immigration scheme":

---

[1] Under 8 U.S.C. § 1226(c), ICE shall take into custody any noncitizen who is inadmissible for having committed any offense under 8 U.S.C. § 1182(a)(2) (specified criminal and related grounds); deportable for having committed any offense covered under 8 U.S.C.  § 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) (specified criminal offenses, including aggravated felonies as defined under 8 U.S.C.  § 1101(a)(43)); deportable under 8 U.S.C.  § 1227(a)(2)(A)(i) (crime involving moral turpitude) for an offense in which the alien has been sentenced to a term of imprisonment for at least one year; or, is inadmissible under 8 U.S.C. § 1182(a)(3)(B) or deportable under section 8 U.S.C. § 1227(a)(4)(B) (national security related grounds).

the "January 20 Memo" issued by DHS and the "February 18 Memo" issued by ICE.

Doc. 1, ¶ 4.

### B.    January 20, 2021 Memo

On January 20, 2021, President Biden issued Executive Order 13993, Revisions

of Civil Immigration Enforcement Policies and Priorities, 86 Fed. Reg. 7051.[2] In

section 1 of the Executive Order, President Biden sets forth the following priorities

regarding immigration enforcement: "to protect national and border security, address

the humanitarian challenges at the southern border, and ensure public health and

safety." 86 FR 7051, § 1. In so doing, President Biden directed "[t]he Secretary of State,

the Attorney General, the Secretary of Homeland Security, the Director of the Office

of Management and Budget, the Director of the Office of Personnel Management, and

---

[2] The effect of this Executive Order was to, among other things, repeal former President Trump's Executive Order No. 13768, which set forth the following immigration enforcement priorities in January 2017:

> DHS shall prioritize for removal those aliens described by the Congress in sections 212(a)(2), (a)(3), and (a)(6)(C), 235, and 237(a)(2) and (4) of the INA (8 U.S.C. 1182(a)(2), (a)(3), and (a)(6)(C), 1225, and 1227(a)(2) and (4)), as well as removable aliens who:
>> (a) Have been convicted of any criminal offense;
>> (b) Have been charged with any criminal offense, where such charge has not been resolved;
>> (c) Have committed acts that constitute a chargeable criminal offense;
>> (d) Have engaged in fraud or willful misrepresentation in connection with any official matter or application before a governmental agency;
>> (e) Have abused any program related to receipt of public benefits;
>> (f) Are subject to a final order of removal, but who have not complied with their legal obligation to depart the United States; or
>> (g) In the judgment of an immigration officer, otherwise pose a risk to public safety or national security.

Enhancing Public Safety in the Interior of the United States, 82 FR 8799 (Jan. 25, 2017).

the heads of any other relevant executive departments and agencies [to] . . . take action, including issuing revised guidance, as appropriate and consistent with applicable law, that advances the policy set forth in section 1 of [the] order." 86 FR 7051, § 2.

In response to the Executive Order, David Pekoske ("Pekoske"), as acting secretary of DHS, issued a memorandum on January 20, 2021 to Miller (senior official performing the duties of commissioner of CBP), Johnson (acting director of ICE), and Renaud (senior official performing the duties of the director of USCIS). Doc. 1-3 (the "January 20 Memo"). The January 20 Memo issued three directives: (1) conduct a comprehensive review of enforcement policies and priorities; (2) provide interim civil enforcement guidelines; and (3) institute an immediate 100-day pause on removals. *Id.* at 3–5.

The comprehensive review of policies required the Chief of Staff to coordinate a department-wide review of policies and practices concerning immigration enforcement and thereafter develop recommendations to address various aspects of immigration enforcement. The Chief of Staff was tasked with making recommendations for the issuance of revised policies within 100 days from the date of the January 20 Memo.  Pending the issuance of revised policies, the Director of DHS identified the following priorities of DHS:

> 1.  **National security**. Individuals who have engaged in or are suspected of terrorism or espionage, or whose apprehension, arrest and/or custody is otherwise necessary to protect the national security of the United States.
> 2.  **Border security**. Individuals apprehended at the border or ports of entry while attempting to unlawfully enter the United States on or after November 20, 2020, or who

5

were not physically present in the United States before November 20, 2020.

3.    **Public safety**. Individuals incarcerated within federal, state, and local prisons and jails released on or after the issuance of this memorandum who have been convicted of an aggravated felony as that term is defined in section 101(a)(43) of the Immigration and Nationality Act at the time of conviction, and are determined to pose a threat to public safety.

Doc. 1-3 at 3. Notwithstanding the listing of priorities, the memo states that "nothing in [the] memorandum prohibits the apprehension or detention of individuals unlawfully in the United States who are not identified as priorities." *Id.* at 4. The final dictate was an immediate 100-day pause[3] on removal of any noncitizens with a final order of removal, subject to certain exceptions,[4] with the pause to go into effect no later than January 22, 2021.

**C.    February 18, 2021 Memo**

On February 18, 2021, Johnson issued a memorandum to all ICE employees regarding interim guidance pertaining to civil immigration enforcement and removal priorities. Doc. 1-4 (the "February 18 Memo"). The interim policies were to take effect immediately and remain in effect until Mayorkas issues new enforcement guidelines

---

[3] Of note, on January 26, 2021, a Southern District of Texas court entered a nationwide temporary restraining order against the 100-day stay of removal, and on February 23, 2021, the court converted its order to a preliminary injunction. *See Texas v. United States*, No. 6:21-cv-3, 2021 WL 723856 (S.D. Tex. Feb. 23, 2021).

[4] Excluded from the pause are individuals who (1) engaged in or are suspected of terrorism or espionage or otherwise pose a danger to national security; (2) were not physically in the United States before November 1, 2020; (3) voluntarily agreed to waive any rights to remain in the United States; or (4) the Acting Director of ICE determines removal is required by law. Doc. 1-3 at 4–5. The Texas court's injunction of the 100-day pause was acknowledged in the February 18 Memo. Doc. 1-4 at 3 and n.3.

after consultation with leadership from ICE, USCIS, and DHS, which was anticipated by mid-May 2021. *Id.* at 2. Johnson requested enhancements to the priorities set forth in the January 20 Memo, which he outlined and included in the guidance provided in the February 18 Memo. The revisions included authorization to apprehend presumed priority noncitizens in at-large enforcement actions without advance approval; inclusion of current qualifying members of criminal gangs and transnational criminal organizations as presumed enforcement priorities; authorization to apprehend other presumed priority noncitizens without prior approval; guidance to evaluate whether a noncitizen who is not a presumed priority poses a public safety threat and should be apprehended; the further delegation of approval authority; and the importance of providing advance notice of at-large enforcement actions to state and local law enforcement. *Id.* at 2–3.

The guidance from the February 18 Memo was to be applied to all civil immigration and removal decisions including whether to issue a detainer or assume custody of a noncitizen subject to a previously issued detainer; to issue, reissue, serve, file or cancel a Notice to Appear; to focus resources only on administrative violations or conduct; to stop, question, or arrest a noncitizen for an administrative violation; to detain or release from custody subject to conditions; to grant deferred action or parole; or when and under what circumstances to execute final orders of removal. *Id.* at 4. The February 18 Memo sets forth the criteria for defining cases that are presumed to be priorities. *Id.* at 5–6. The Memo clarifies, however, that "the interim policies do not require or prohibit the arrest, detention, or removal of any noncitizen." *Id.* at 4.

Consistent with the January 20 Memo, the priority categories identified in the February 18 Memo were: (1) national security; (2) border security; and (3) public safety. As it pertains to public safety, "[a] noncitizen is *presumed* to be a public safety enforcement and removal priority if he or she poses a threat to public safety and:

> 1) he or she has been convicted of an aggravated felony as defined in section 1101(a)(43)[5] of the INA; or
> 2) he or she has been convicted of an offense for which an element was active participation in a criminal street gang, as defined in 18 U.S.C. § 521(a), or is not younger than 16 years of age and intentionally participated in an organized criminal gang or transnational criminal organization to further the illegal activity of the gang or transnational criminal organization.

Doc. 1-4 at 5–6 (emphasis in original). Officers may consider factors such as seriousness and recency of criminal activity when determining whether an individual poses a threat to public safety. Officers may also take into consideration mitigating factors such as family circumstances, health and medical factors, evidence of rehabilitation, ties to the community, and whether the individual has potential immigration relief available. *Id.* at 6. For those individuals not meeting the criteria of a presumed priority, officers should obtain preapproval before civil enforcement or removal action. *Id.*

**D.   Litigation**

Following Defendants' issuance of the January 20 and February 18 Memoranda, Florida sued Defendants arguing it is being irreparably harmed because

---

[5] The term "aggravated felony" is defined in 8 U.S.C. § 1101(a)(43). The memo incorrectly references section 101(a)(43). The correct section has been used in this order.

of ICE's refusal, in violation of law, to take custody of criminal noncitizens in the State of Florida, resulting in their release into Florida. Florida sues Defendants under the Administrative Procedures Act ("APA") for agency action alleged to be in excess of authority (Count 1), arbitrary and capricious agency action under the APA (Count 2), failure to provide notice and comment as required by the APA (Count 3), violation of 8 U.S.C. § 1226(c) (Count 4), violation of 8 U.S.C. § 1231(a)(1)(A) (Count 5), violation of the take care clause (Count 6), and violation of the separation of powers (Count 7). Doc. 1. Florida seeks an order from this Court setting aside the January 20 and February 18 Memos as unlawful, issuance of preliminary and permanent injunctive relief enjoining Defendants from enforcing the January 20 and February 18 Memos, issuance of declaratory relief declaring the January 20 and February 18 Memos are *ultra vires* and unconstitutional, postponing the effective date of the January 20 and February 18 Memos, and awarding Florida attorney's fees and costs. *Id.* at 27.

### E.    Florida's Motion and the Government's Response

In its motion for preliminary injunction, Florida argues it will be irreparably harmed by the enforcement of the policies in the January 20 and February 18 Memos, ICE's refusal to take custody of criminal noncitizens in the State of Florida, and the resulting release of criminal noncitizens into Florida communities. Doc. 4. Florida argues it has standing to seek the requested relief and that the increasing number of criminal noncitizens released into Florida will cause a variety of harms. Florida contends that this Court may review the agency actions in the memos and further argues the memos exceed DHS's and ICE's statutory authority and are contrary to

law. Florida submits that it is likely to succeed on the merits of its claims and that the balance of equities and public interest favor preliminary injunctive relief.

In support of its motion, Florida cites to numerous examples of ICE detainers being withdrawn or lifted for criminal noncitizens whom, Florida argues, should be taken into custody upon their release and removed. Docs. 4-1; 4-2; 29-1. Instead, ICE's refusal to act because of the interim policies' new guidance has resulted in criminal noncitizens being released into Florida, which Florida submits directly contradicts the dictate of 8 U.S.C. § 1231(a)(1)(A), which requires "when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days."

Defendants oppose Florida's motion for preliminary injunction. Doc. 23. Defendants submit that Florida's motion seeks to have this Court dictate where DHS should focus its limited resources. Defendants argue that Florida lacks standing because it is unable to show it is under a threat of actual and imminent injury. *Id.* at 14–17. Further, Defendants argue the agency actions are not subject to judicial review and that Florida is unlikely to prevail on the merits of its claims. According to Defendants, the balance of equities and public interest disfavor a preliminary injunction because the requested relief interferes with the federal government's discretionary judgment as to where it should dedicate its resources. *Id.* at 32.

Generally, Defendants respond that every administration has to implement some priority scheme. Admittedly, DHS is unable to arrest, detain, and remove all noncitizens unlawfully in the United States. Hence, the need for priorities, but the

establishment of priorities does not prohibit the arrest or detention of any noncitizen. And, indeed, the January 20 and February 18 Memos state such.

Defendants urge that the Memoranda at issue are agency actions which are discretionary and therefore not subject to judicial review under the APA. Although Florida claims the statutory provisions' use of "shall" removes the Government's discretion when it comes to removal of criminal aliens, Defendants respond that the word "shall" in section 1226(c)(1) does not mean covered individuals will be arrested *immediately* following their release. Doc. 23 (citing *Nielsen v. Preap*, 139 S. Ct. 954, 969 (2019)).

Regarding the specific noncitizens whose detainers have been lifted and whom ICE purportedly refuses to take into custody, Defendants submit that at least five of the individuals are either not removable or are not subject to section 1226(c) at this time. Defendants explain that at least some of the noncitizens were not convicted of any crimes in Florida that are classified as "aggravated felonies," as defined by 8 U.S.C. § 1101(a)(43). Defendants further state they have issued detainers for two of the individuals and, admittedly, lifted a third detainer on another noncitizen in error. *See* Doc. 23-4.

## II.   LEGAL STANDARD

A party seeking entry of a preliminary injunction must establish: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) the threatened injury to the moving party outweighs whatever damage the proposed injunction may cause the opposing party;

and (4) if issued, the injunction would not be adverse to the public interest. *Forsyth Cty. v. U.S. Army Corps of Eng'rs*, 633 F.3d 1032, 1039 (11th Cir. 2011) (quotations omitted). "A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the burden of persuasion as to the four requisites." *Am. C.L. Union of Fla., Inc. v. Miami-Dade Cty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009) (citation omitted). The entry of a preliminary injunction is "the exception rather than the rule, and plaintiff must clearly carry the burden of persuasion." *Siegel v. LePore*, 234 F.3d 1163, 1179 (11th Cir. 2000) (quoting *Texas v. Seatrain Int'l, S.A.*, 518 F.2d 175, 179 (5th Cir. 1975)).

## III.   DISCUSSION

### A.   100-day Pause

At the hearing, the parties agreed the 100-day pause was no longer a focal issue in the instant litigation because of the Texas court's entry of a nationwide injunction, which the United States did not appeal. Doc. 32 at 4–5. As a practical matter, the 100-day pause would have expired of its own accord by the end of April 2021 before an appeal of the injunction could have been heard. Thus, the issue of the 100-day pause is moot as to the instant motion and the motion is due to be denied on this basis.

### B.   Standing

"The constitutionally minimum requirements for standing are three-fold." *Am. C.L. Union of Fla.*, 557 F.3d at 1190 (quoting *Fla. State Conference of the NAACP v. Browning*, 522 F.3d 1153, 1159 (11th Cir. 2008)).

> First, the plaintiff must have suffered, or must face an imminent and not merely hypothetical prospect of suffering, an invasion of a legally protected interest resulting in a "concrete and particularized" injury. Second, the injury must have been caused by the defendant's complained-of actions. Third, the plaintiff's injury or threat of injury must likely be redressible by a favorable court decision.

*Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). In discussing the injury requirement, the Supreme Court elaborates that it must be "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal quotation marks and citation omitted). Regarding the causal connection, the Court explains "the injury has to be 'fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court.'" *Id.* The third constitutional minimum for standing requires the injury to be likely to be redressable by a favorable decision, as opposed to merely speculative. *Id.* at 561 (internal quotation marks and citation omitted).

Florida contends that three theories support its standing here to challenge the prioritization scheme in the January 20 and February 18 Memos. Citing *Massachusetts v. EPA*, 549 US 497 (2007), Florida first contends that its standing to challenge the Government's immigration policies, is grounded in its entitlement to "special solicitude." Thus, Florida argues that "a litigant to whom Congress has 'accorded a procedural right to protect his concrete interests,'—here, the right to challenge agency action unlawfully withheld, § 7607(b)(1)—'can assert that right without meeting all the normal standards for redressability and immediacy.'" *Id.* at 517–18. Florida submits its standing is predicated on its entitlement to protect its quasi-sovereign interests

13

where it is otherwise unable to do so because "the removal process is entrusted to the [sole] discretion of the Federal Government," *Arizona v United States*, 567 U.S. 387, 409 (2012); *see also Galvan v. Press*, 347 U.S. 522, 531 (1954) ("Policies pertaining to the entry of aliens and their right to remain here are . . . entrusted exclusively to Congress[.]").

Defendants respond that although the *Massachusetts v. EPA* opinion recognized a special solicitude for states, there nevertheless must still be some concrete actual injury. The Supreme Court recognized the "special position and interest of Massachusetts," and noted that "States are not normal litigants for the purposes of invoking federal jurisdiction." *Massachusetts*, 549 US at 518. The Court went on to discuss the injury requirement stating, "[t]he harms associated with climate change are serious and well recognized" and that the "EPA's steadfast refusal to regulate greenhouse gas emissions presents a risk of harm to Massachusetts that is both 'actual' and 'imminent.'" *Id.* at 521 (citations omitted). Thus, despite Florida's "special position" here, the analysis still requires demonstration of an actual and imminent harm.

Florida argues the release, instead of removal, of criminal noncitizens irreparably harms Florida. In support, Florida provides the Court with national statistics on recidivism among released prisoners. Doc. 4-11. Thus, Florida argues a second basis to support its standing is the resulting increase in criminal noncitizens released in Florida that will cause irreparable harm to Florida. Specifically, Florida argues the increase in criminal noncitizens will cause an increase in crimes in Florida

which, in turn, will require Florida to expend considerable resources. Florida cites to higher expenses associated with increased state law enforcement, mental health and substance-abuse programs, and crime victims' assistance programs.

Defendants respond that Florida's claimed injuries are speculative. Because DHS prioritizes those noncitizens who pose the greatest risk (*e.g.*, those who are terrorist threats, those who have committed aggravated felonies, and those involved in gang-related activities), Defendants argue this does not necessarily translate into a decrease in overall enforcement actions nor an increase in criminal activity. Florida, on the other hand, argues that it does result in a decrease in enforcement activity, citing to an ICE email produced in another case discussing the expected impact of the interim enforcement priorities resulting in a fifty percent decrease in "book ins" compared to historical numbers. Doc. 34-2. Florida argues this is borne out by recent data showing current ICE interior enforcement—which is at issue in this litigation—has plummeted. Doc. 34 at 3. Florida contends this defeats Defendants' argument that the memos merely represent a reallocation of resources instead of reflecting the reality that the interim policies have resulted in a drastic reduction in interior immigration enforcement. *Id.* at 4. As pointed out by the Government, however, the evidence proffered by Florida speaks to a reduction in enforcement against noncitizens *generally*, regardless of whether they are covered by section 1226(c) or whether or not they reside in Florida, making the data unpersuasive on the instant motion. *See* Doc. 36.

Moreover, the Government urges that the mere threat of possible future criminal conduct and the costs incurred by Florida as a result are too tenuous to

constitute a concrete, cognizable injury.[6] The Court agrees and finds the opinion in *Arpaio v. Obama*, 797 F.3d 11 (D.C. Cir. 2015) to be informative on this point. In *Arpaio*, the County Sheriff challenged the constitutionality and validity of the Deferred Action for Childhood Arrivals (DACA) and the Deferred Action for Parents of Americans (DAPA) programs. The effect of the programs was to deprioritize removals of non-dangerous individuals to allow federal agencies to focus their limited resources on removing dangerous criminals. *Id.* at 14. The Sheriff sued the President and other federal officials "seeking a declaration and preliminary injunction that DACA and DAPA violated the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, namely the President's constitutional duty to 'take Care that the Laws be faithfully executed,' U.S. Const. art. II, § 3, and the non-delegation doctrine." *Arpaio*, 797 F.3d at 18.

The district court dismissed the Sheriff's complaint finding he failed to allege a cognizable injury in fact for purposes of Article III standing. *Arpaio v. Obama*, 27 F. Supp. 3d 185, 192, 207 (D.D.C. 2014). In affirming the lower court's finding that the Sheriff lacked standing, the appellate court held that although "the Sheriff's Office's expenditures of resources on criminal investigation, apprehension, and incarceration of criminals are indeed concrete, . . . Sheriff Arpaio lacks standing to challenge DACA and DAPA because any effects of the challenged policies on the county's crime rate

---

[6] Defendants also argue that to the extent the State of Florida points to the injuries suffered by its citizens who fall victim to a criminal noncitizen as a basis to demonstrate the State's standing is unavailing. An increase in crime does not equate to an injury to *the State*. States generally may not bring suit on behalf of their citizens against the federal government. *See Chiles v. Thornburgh*, 865 F.2d 1197, 1209 (11th Cir. 1989).

are unduly speculative." *Arpaio*, 797 F.3d at 19. There, the court held that Sheriff Arpaio presented a non-justiciable "generalized grievance," as opposed to a particularized injury. *Id.* at 18. Thus, it concluded the Sheriff's allegations that DACA and DAPA will cause unlawful immigration to increase were "conjectural and conclusory." *Id.* at 21.

The *Arpaio* court further held that even if it were to "ignore the disconnect between the challenged policies and the increased law enforcement expenditures that Sheriff Arpaio predicts, his reliance on the anticipated action of unrelated third parties makes it considerably harder to show the causation required to support standing." *Id.* at 20. Although it is not impossible to find standing in a case that turns on third-party conduct, "it is ordinarily substantially more difficult to establish." *Id.* at 20 (quoting *Lujan*, 504 U.S. at 562) (internal quotation marks omitted). Florida's analysis here similarly relies on predictions of future criminal conduct by released noncitizens and the potential for increased expenditures that follow the anticipated increase in crime. Even assuming that application of the interim policies results in decreased interior immigration enforcement, whether the challenged interim policies will thereafter result in an increase in criminal activity in Florida requires stacking assumptions and is speculative. Further, the possibility that future economic injury will result is the type of speculative injury the D.C. Circuit rejected in *Arpaio* as a basis for establishing standing.

At the hearing on the instant motion, however, Florida clarified that it not only claims standing exists based on the fact that potential future criminal conduct will

result in increased forthcoming expenses to the State. Rather, Florida offers a third basis for standing, evidenced by the expenses incurred by Florida due to criminal noncitizens re-entering society on supervised release. Florida contends it is incurring actual costs for released noncitizens being under community supervision that Florida would not normally incur if the federal government would fulfill its duty and take custody of the criminal noncitizens and institute their removal as required by law. The probation costs to the State for overseeing these noncitizens on supervised release are concrete and particularized injuries that are fairly traceable to the federal government's withdrawal of retainers on noncitizens that they would have otherwise taken into custody. The Court finds that such concrete injury satisfies both the requirements of an actual and imminent injury and a causal connection to Defendants' conduct.

Whether such injury is redressable by a favorable ruling, however, is not as clear. Defendants argue that every administration must, by necessity, institute some prioritization scheme. Therefore, even if the interim priorities were enjoined, Defendants submit a different scheme would have to be implemented and may not satisfy Florida nor redress its alleged injury. But that is not the test for determining redressability. The opinion in *Massachusetts v. EPA* is instructive on the matter, recognizing a State's special solicitude in the standing analysis. 549 U.S. at 520. As the Supreme Court explained, in a procedural rights challenge such as this, the litigant vested with that procedural right "has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Id.* at 518 (citations omitted). Under this standard, the

Court concludes that redressability is likely met because there is some possibility that Florida's challenges will cause the United States to reconsider its immigration enforcement policies.

The Court is aware the policies at issue are interim policies that, by their nature, are going to be reconsidered and evaluated by Defendants, notwithstanding this litigation. Nevertheless, the redressability element of standing, albeit not eliminated in this context, is considered relaxed, *see id.* at 517–18 (not requiring the "normal" standards be met for redressability), and thus, Florida is able to satisfy the redressability element. As Florida has satisfied the elements of injury, traceability, and redressability, Florida establishes its standing on the instant motion.

## C.   Review of Agency Action

Florida argues the January 20 and February 18 Memos are agency actions reviewable by this Court under the Administrative Procedures Act ("APA") because the APA creates a "basic presumption of judicial review." Doc. 4 (quoting *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2567 (2019)); *see also* 5 U.S.C. § 702 ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."). Florida requests, pursuant to 5 U.S.C § 705, that the court "postpone the effective date of action" taken by the Defendant agencies "pending judicial review."

Under 5 U.S.C. § 704, the APA allows challenges only to "final agency action." Section 704 states:

> Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

5 U.S.C. § 704.

Defendants argue that the interim policies here are not final agency action, and therefore not subject to judicial review. The Court agrees with Florida that the "interim" label alone does not necessarily make the actions nonfinal. *See U.S. Army Corps of Engineers v. Hawkes Co.*, 136 S. Ct. 1807, 1814 (2016) (the ability to revise an agency action based on new information "is a common characteristic of agency action, and does not make an otherwise definitive decision nonfinal"); *Sackett v. E.P.A.*, 566 U.S. 120, 127 (2012) ("The mere possibility that an agency might reconsider in light of 'informal discussion' and invited contentions of inaccuracy does not suffice to make an otherwise final agency action nonfinal."). But, by their terms, the prioritization scheme here is short-term guidance with the anticipation of new guidelines within 90 days of February 18, 2021. *See* Doc. 1-4 at 2. Moreover, what makes an agency action "final" has been described as an action that "determines rights or obligations" from which "legal consequences flow." *Sackett*, 566 U.S. at 126 (internal punctuation and citations omitted). The immigration prioritization scheme outlined in the January 20

20

and February 18 Memos do not determine anyone's legal rights. The Memos do not change any person's legal status; they do not prohibit enforcement of any law; they do not determine any legal benefits; and they do not change prior agency action. The interim memoranda provide guidance and specifically confirm they do not create any right or benefit. *See* Docs. 23-1 at 5; 23-2 at 8.

The Supreme Court has outlined several factors for courts to consider in determining whether an agency action is final: "(1) whether the agency action constitutes the agency's definitive position; (2) whether the action has the status of law or affects the legal rights and obligations of the parties; (3) whether the action will have an immediate impact on the daily operations of the regulated party; (4) whether pure questions of law are involved; and (5) whether pre-enforcement review will be efficient." *Tennessee Valley Auth. v. Whitman*, 336 F.3d 1236, 1248 (11th Cir. 2003). (citing *FTC v. Standard Oil of Calif.*, 449 U.S. 232, 239–43 (1980)). Applying these factors to the interim immigration enforcement policies at issue here, the Court cannot conclude that the Memos constitute the agency's definitive position. Clearly, the interim policies are a work in progress as evidenced by the additions to the policies from the January 20 Memo to the February 18 Memo. Moreover, the February 18 Memo indicates that the Secretary is continuing to get input from the leadership of ICE, CBP, and DHS. The guidelines are just that; they are not statutes and do not have the status of law as they constitute a prioritization and not a prohibition of enforcement. The policies do not change anyone's legal status nor do they prohibit the enforcement of any law or detention of any noncitizen. The prioritization scheme does

not necessarily have a direct day-to-day impact on Florida, although certainly an indirect impact can be claimed. Regarding the challenge to these interim policies, the challenge is more likely to create piecemeal litigation and therefore be less efficient. As noted previously, the interim policies were only intended for an approximate 90-day period. Thus, the Court concludes that the prioritization scheme that is at issue[7] does not constitute final agency action reviewable under the APA.

Even if the Court were to conclude the agency action is final reviewable action, the Court agrees with Defendants that the memoranda reflect discretionary agency decisions related to the prioritization of immigration enforcement cases, which are presumptively not subject to judicial review. Although Florida relies on what it claims is the mandatory statutory language of sections 1226 and 1231 that state DHS "shall" engage in certain enforcement actions, the fact is the memoranda in no way prohibit any enforcement action. Instead, the January 20 and February 18 Memos focus and prioritize the cases of immigration enforcement given the resources available in light of what DHS deems most pressing. The prioritization scheme does not prohibit any enforcement action.

The issues before this Court differ from those recently before the Texas District Court on related matters. The 100-day pause addressed by that court dealt with inaction—referred to as a pause—on the part of Defendants. While Florida claims that the prioritization scheme constitutes a similar wholesale abdication of the federal

---

[7] Per the parties' representations at the hearing, the 100-day pause is no longer at issue on the instant motion.

government's duties, such is not the case. The ordering of priorities is not a refusal to act, but rather is a specific choice to act as it relates to certain matters over others. Here, Florida simply disagrees with the choices made by the Biden Administration as to the priorities. It is undisputed, however, that "[a]n agency generally cannot act against each technical violation of the statute it is charged with enforcing." *Heckler v. Chaney*, 470 U.S. 821, 831–32 (1985). Thus, there must necessarily be a prioritization. And the Supreme Court has recognized, "[t]he agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.*

Having concluded that the agency action at issue here is not subject to judicial review, the Court need not address the merits of Florida's APA claims. Accordingly, it is hereby

**ORDERED**:

1. Florida's Unopposed Motion for Leave to Amend its Motion for Preliminary Injunction (Doc. 34) is **GRANTED**.

2. Florida's Motion for a Preliminary Injunction (Doc. 4) is **DENIED**.

**DONE AND ORDERED** in Tampa, Florida on May 18, 2021.

Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record and Unrepresented Parties, if any

23